UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARK JOHNSON, )
on behalf of himself and all others )
similarly situated, )
)
                Plaintiffs, )
) **JURY DEMANDED**
      v. )
) Civil Action No.
MORTON'S RESTAURANT GROUP, INC., ) 05-11058-MLW
and MORTON'S OF CHICAGO, INC. )
)
                Defendants. )
)

## FIRST AMENDED COMPLAINT

**I.   INTRODUCTION**

    1     This is an action brought under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq., by Mark Johnson on behalf of himself and other current and former waitstaff employees at Morton's of Chicago restaurants, an upscale steakhouse chain, throughout the United States, which are owned and operated by Defendants Morton's Restaurant Group, Inc., Morton's of Chicago, Inc., and their affiliates ("Morton's"). As set forth below, Morton's has had a longstanding national policy throughout its restaurants under which its waitstaff employees have not been permitted to retain all of their tips and yet have received less than the permissible standard minimum wage, as Morton's has improperly taken a "tip credit" against the minimum wage for these employees. On behalf of himself and all others similarly situated who may choose to opt-in to this action, plaintiff Mark Johnson now seeks restitution for the tips they have not been permitted to retain, as well as the portion of the minimum wage that they did not

receive in base pay, liquidated damages, attorneys' fees and costs, and any other damages to which they may be entitled under law.

## II. PARTIES

2.  Plaintiff Mark Johnson is an adult resident of Cambridge, Massachusetts. Mr. Johnson worked as a waiter at Morton's of Chicago in Boston, Massachusetts, from May 1998 until July 2002.

3.  Mr. Johnson brings this action on his own behalf and on behalf of all others similarly situated, who may choose to opt-in to this case. This opt-in class may exclude waiters who have participated in similar actions that have resolved or are currently pending.

4   Defendant Morton's Restaurant Group, Inc., is a Delaware corporation that owns and operates more than 60 Morton's of Chicago restaurants throughout the United States.

5   Defendant Morton's of Chicago, Inc., is an Illinois corporation affiliated with Defendant Morton's Restaurant Group, Inc., that also participates in the operation of more than 60 Morton's of Chicago restaurants throughout the United States.

## III. JURISDICTIONAL STATEMENT

6   The jurisdiction of this court is invoked pursuant to 28 U.S.C. § 1331. This case arises under the laws of the United States of America.

## IV. STATEMENT OF FACTS

7   In its restaurants throughout the United States (with a few limited exceptions), Morton's waitstaff have received a base pay which is less than the standard federal minimum wage, currently $5.15 per hour. Morton's waitstaff are generally paid

the "service minimum wage" applicable in each state. For states that do not have their own service minimum wage, Morton's waitstaff are paid the federal service minimum wage, which is currently $2.13 per hour. In some states, the state minimum wage rate which the waitstaff receive is somewhat higher, but still less than the standard federal minimum wage. For example, in Massachusetts, Morton's waitstaff, including Mr. Johnson, received the state service minimum wage, which is currently $2.63 per hour.

8. Morton's employees have not been permitted to retain all of their tips.

9. Instead, under a formula devised by management, tipped employees are required to "tip out" various other employees from the tips they receive from customers, including a percentage of their tips to management.

10. In each Morton's restaurant, there is a set percentage of tips that waitstaff employees are expected to pay to their managers. These managers are not traditionally tipped employees. The managers whom waitstaff are expected to tip out include General Managers, as well as other managers. The managers whom waitstaff are expected to tip out include those who have power to hire and fire and who would be classified as "employers" under the FLSA.

11. Morton's does not explain to its waitstaff employees that it intends to take a "tip credit" against the minimum wage, that it intends to treat tips as satisfying part of their minimum wage obligation, nor does it explain anything to its waitstaff about a "tip credit" or what a "tip credit" is.

12. Morton's has been subjected to a number of investigations and legal actions regarding its tip policy in certain parts of the country, which should have placed it

3

on notice of its legal violation, but Morton's has nevertheless maintained this policy as a general policy throughout the country.

13.     Morton's violation of the minimum wage and "tip credit" requirements of the FLSA, in requiring or expecting its waitstaff employees to tip out managers and other non-traditionally tipped employees, has been knowing and willful.

## COUNT I

### FAIR LABOR STANDARDS ACT, 29 U.S.C. §§ 201 et seq.

Defendants' conduct, as set forth above, in failing to pay its waitstaff employees the full federal minimum wage, in failing to allow these employees to retain all of their tips, and in failing to provide the legally required notice regarding its intention to take a "tip credit," violates the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. As set forth above, Defendants have improperly taken a "tip credit" against the minimum wage in violation of 29 U.S.C. § 203(m).

## JURY DEMAND

Plaintiffs request a trial by jury on their claims.

WHEREFORE, Plaintiffs request that this Court enter the following relief:

1. Opportunity to notify other similarly situated employees of their right to opt-in to this action;

2. Restitution for tips that Morton's waitstaff employees have not been permitted to retain;

3. Restitution for the portion of the minimum wage that Morton's waitstaff employees have not received in base pay;

4

4.  Liquidated damages;

5.  Attorneys' fees and costs; and

6.  Any other relief to which Plaintiffs may be entitled.

>Respectfully submitted,
>
>MARK JOHNSON, on behalf of himself and all others similarly situated,
>
>By his attorney,
>
>*/s/ Shannon Liss-Riordan*
>Shannon Liss-Riordan, Esq., BBO # 640716
>PYLE, ROME, LICHTEN, EHRENBERG
>   & LISS-RIORDAN, P.C.
>18 Tremont Street, 5th Floor
>Boston, MA 02108
>(617) 367-7200

Dated: May 26, 2005

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARK JOHNSON, )
on behalf of himself and all others )
similarly situated, )
)
)
Plaintiffs, )
)
v. )
)
MORTON'S RESTAURANT GROUP, INC., )
)
Defendant. )

### AFFIDAVIT OF MARK JOHNSON

I, Mark Johnson, hereby declare under penalty of perjury under the laws of the United States that the following is true and correct:

1. My name is Mark Johnson. I reside in Cambridge, Massachusetts. I am over the age of 18 and otherwise competent to testify. Unless expressly stated otherwise, the statements made in this declaration are based upon my personal knowledge.

2. I am a named Plaintiff in the above-referenced matter. I was employed as a server for the Morton's restaurant located at One Exeter Plaza in Boston, Massachusetts, from approximately May 1988 until July 2002.

3. Throughout my employment with Morton's, I, like all servers, received a base pay at the "service minimum wage," which is less than the standard federal minimum wage. At the end of my employment, this rate was $2.63 per hour. I also received tips from customers, but Morton's did not permit me to retain all my tips.

4. Instead, under a formula devised by management, tipped employees, including myself, were expected to hand over to various other employees percentages of the tips we

received from customers. Under this "tip-out" formula, we paid 7% of our tips to management. This was the case throughout my entire employment with Morton's.

5.  The managers whom we were expected to tip out included the General Manager as well as other managers.

6.  Morton's did not, at any time during my employment there, explain that it intended to take a "tip credit" against the minimum wage for servers, that it intended to treat tips as satisfying part of its minimum wage obligation, nor did it explain anything about what a "tip credit" is.

7.  During and since my employment with Morton's, other servers expressed to me dissatisfaction with the company's requirement that servers share their tips with managers among other employees. These servers have included servers outside of Massachusetts, including friends in California. I believe that many current and former Morton's servers would be interested in participating in this litigation if given notice of an opportunity to opt-in to the case.

Signed under pains and penalties of perjury, this __19__ day of May 2005.

_Mark Johnson_ (signature)
Mark Johnson

Page 470

VOLUME IV
PAGES 470-690
EXHIBITS: Per Index



AMERICAN ARBITRATION ASSOCIATION

AAA Case No.: 11 160 00217 03

DAVID BILBILIAN,                    )
    Complainant,                    )
                                    )
    v.                              )
                                    )
MORTON'S OF CHICAGO/BOSTON,         )
INC.,                               )
    Respondent.                     )


BEFORE:  Mark L. Irvings, Arbitrator


DAY FOUR OF ARBITRATION


PYLE, ROME, LICHTEN & EHRENBERG, P.C.
        18 Tremont Street
        Boston, Massachusetts


        Tuesday, March 9, 2004
        Commencing at 10 a.m.

```
                                              Page 471
1    APPEARANCES:
2    PYLE, ROME, LICHTEN & EHRENBERG, P.C.
3      BY:  Shannon Liss-Riordan, Esq.
4           M. Amy Carlin, Esq.
5      18 Tremont Street, Suite 500
6      Boston, Massachusetts 02108
7      (617) 367-7200
8      sliss@prle.com
9      On behalf of the Complainant.
10
11   JACKSON LEWIS LLP
12     BY:  Elise M. Bloom, Esq.
13          Diane Windholz, Esq.
14     59 Maiden Lane
15     New York, New York 10038
16     (212) 545-4000
17     bloome@jacksonlewis.com
18     On behalf of the Respondent.
19
20   ALSO PRESENT:
21     Janet Hofman
22
23
24
25
```

```
                                              Page
1                 EXHIBITS
                  (cont'd)
2    NO.  DESCRIPTION              For ID/In Evd.
3    Q    Counseling Form with attachments   635
4    B    David Bilbilian's Application      663
         for Employment at Morton's,
5        7/2/96
```

```
                                              Page 472
1                   INDEX
2    Testimony of:  Direct  Cross  Redirect  Recross
3    DAVID BILBILIAN
       by Ms. Liss-Riordan
4           474           664
       by Ms. Bloom
             564           684
5
6
7
8
9                  EXHIBITS
10   NO.  DESCRIPTION              For ID/In Evd.
     C-8  Recognition Form for David     514
11        Bilbilian, 8/14/02
12   J    Counseling Form, 6/6/02        519
13   M    Counseling Form, 10/18/02      522
14   N    Counseling Form, 11/6/02       525
15   P    Counseling Form, 11/9/02       529
16   C-14 e-mail from Eric Klein,        564
          11/22/02
17
     C-15 W-2 Forms for David Bilbilian  564
18        for 2001 and 2002
19   F    Disciplinary Act on Report,    585
          1/22/01
20
     G    Counseling Form, 5/30/01       590
21
     H    Counseling Form, 10/19/01      591
22
     I    Counseling Form, 12/20/01      592
23
     K    Counseling Form, 8/3/02        601
24
     O    Counseling Form, 11/9/02       612
25
```

```
                                              Page
1              PROCEEDINGS
2         DAVID BILBILIAN, Sworn.
3             * * * * * * *
4    DIRECT EXAMINATION BY MS. LISS-RIORDAN
5    Q.  Good morning, Mr. Bilbilian.
6    A.  Good morning.
7    Q.  I'm going to ask you first just to tell us a
8        little bit about yourself.  Where were you
9        born?
10   A.  Worcester, Massachusetts.
11   Q.  Have you lived in Massachusetts your whole
12       life?
13   A.  Also Florida.
14   Q.  Are you married?
15   A.  Yes.
16   Q.  Do you have kids?
17   A.  Yes, two.
18   Q.  Boys?  Girls?
19   A.  Two boys.  Three and two.
20   Q.  Can you tell me when you were born?
21   A.  June 8th, 1968.
22   Q.  And, Mr. Bilbilian, at some point in your
23       life did you begin working as a waiter?
24   A.  Yes, I did.
25   Q.  Where did you first start working as a
```

Page 475

waiter?
A. At the Top of the Tower restaurant at the Boca Raton Resort & Club.
Q. So this is when you were living in Florida.
A. Yes.
Q. How long did you live in Florida for?
A. Almost five years.
Q. And other than those five years in Florida, have you lived in Massachusetts for the rest of your life?
A. Yes.
Q. At some point did you begin working for Morton's of Chicago?
A. Yes.
Q. When did you start working for Morton's of Chicago?
A. August 8th, 1996.
Q. And where was it that you began working for Morton's in August 1996?
A. West Palm Beach, Florida.
Q. What was your position at Morton's in West Palm Beach?
A. Server.
Q. And can you describe for us how you were compensated as a server at Morton's in West

Page 476

Palm Beach?
A. Guest gratuities --
   MS. BLOOM: Objection. Relevance. There's no issue in the case about what did or did not go on in West Palm Beach. And even to the extent his retaliation claim is based on what was going on here in Massachusetts, that's premised on a state law in Massachusetts. So the compensation structure for it has nothing to do with this case.
   MS. LISS-RIORDAN: I'm only going to be asking a couple of questions. And part of our case is that Morton's has a nationwide system for how its servers and its managers are compensated. I'm only going to ask about two questions about Florida.
   MS. BLOOM: This has nothing to do with any kind of a nationwide issue. There's no federal claim in this case. There's never been any federal claim. Even in the wage case we were talking about an alleged violation of the Massachusetts state statute. So what does or does not go on in

Page 477

1  Florida has absolutely no bearing on
2  Mr. Bilbilian's case.
3      THE ARBITRATOR: It's potentially
4  relevant as to whether there was a national
5  policy or a national practice for wage
6  compensation and arguably perfectly
7  appropriate in some cases, potentially
8  inappropriate in others. So go ahead.
9  Q. Mr. Bilbilian, can you describe how you were
10    compensated as a waiter at Morton's in West
11    Palm Beach?
12 A. Guest gratuities, and the hourly wage was
13    two dollars and I think somewhere around
14    fifty cents.
15 Q. And did you retain all the guest gratuities
16    that were left for you when you worked at
17    West Palm Beach?
18 A. No.
19 Q. What, if anything, happened to some of your
20    gratuities?
21 A. We gave --
22      MS. BLOOM: Same objection.
23  Relevance.
24      THE ARBITRATOR: That's fine. It's
25  standing.

Page 478

1  A. We gave 10 percent to the bus staff,
2     5 percent to the bar staff and 10 percent to
3     management.
4      THE ARBITRATOR: And how much to
5  management?
6      THE WITNESS: 10 percent.
7  Q. How did you know to give 10 percent of your
8     gratuities to management?
9  A. That's how I was trained. And also training
10    cards. We did a monetary breakdown at the
11    end of the night, and the percentage you
12    were told by your trainer as to what you
13    left.
14 Q. How did you like working for Morton's in
15    Florida?
16 A. Loved it.
17 Q. How did you get along with the managers
18    there?
19 A. Very well.
20 Q. And your coworkers, how were your
21    relationships with your coworkers?
22 A. Excellent. We all had a great
23    relationship. I actually still have a great
24    relationship with most of them.
25 Q. And customers, can you describe how you got

Page 483

Boston Morton's?
    MS. BLOOM: Objection. Lack of foundation.
    THE ARBITRATOR: What was he told and what did he do? Let's get him to Boston.
Q. Can you tell me more about what your manager told you when you asked if you could transfer to Boston?
A. Well, I can actually tell you I was present in the office when the general manager made the phone call to the general manager in Boston, and he was very complimentary of myself.
    And after that phone call, we had waited for a return call which we received. And then I transferred and came to Boston.
Q. Were you excited to come to -- or how did you feel about being able to transfer?
A. Very excited.
Q. And why were you excited about transferring to Boston?
    (Brief interruption.)
    MS. BLOOM: Can I have the question?

Page 484

    (Pending question read by reporter.)
A. First and foremost would be my family. And I was excited to be back home.
Q. And in your understanding, how did working at the Morton's in Boston compare financially with working at Morton's in Florida?
A. Much more money.
Q. And why was that?
A. Well, Florida was so seasonal that you really only had five months of busy service. And the Boston store was -- we had a lot of corporate expense accounts circulating through the restaurant, and it was just much more money in the City of Boston.
Q. So when did you begin working at Morton's in Boston?
A. Somewhere around September 10th of '98.
Q. 1998?
A. Yes.
Q. And when you came to the Morton's in Boston, how did you like working there?
A. Loved it.

Page 485

1 Q. Can you tell me a little bit about how you
2    got along with your managers when you first
3    started at Morton's in Boston?
4 A. Very well. They were very complimentary.
5    They seemed very happy that I was there.
6 Q. How was your relationship with your
7    coworkers in Boston when you first started?
8 A. Very good. Very good. Pretty much as soon
9    as I had been settled, I had pretty much
10   made it a point that I helped everyone. So
11   I think for that, a lot of the newer servers
12   liked me and a lot of the senior servers
13   respected me.
14 Q. And can you tell us a bit about your
15   relationships with customers at the Boston
16   Morton's? How was it?
17 A. Very good. Very good. I had a very good
18   following. And I would get very frequent
19   call parties, people that would call up and
20   ask if I was working or ask if they could be
21   in my station or what nights I would be
22   working.
23 Q. And how were the gratuities that you
24   received from customers at the Boston
25   Morton's?

Page 486

1 A. Excellent. At certain points we had
2   actually documented gratuities, and I feel
3   comfortable in saying that I was probably at
4   the top of the list, if not the top three
5   for gratuities.
6 Q. You were near the top in terms of
7   percentages --
8 A. Percentages.
9 Q. -- of gratuities left?
10 A. Yes, percentages.
11 Q. When you began working at the Morton's in
12   Boston, can you tell me how you were
13   compensated?
14 A. Guest gratuity.
15 Q. Did you receive a base pay from Morton's?
16 A. $2.63 I think it was right around that time
17   in '98. Somewhere in the $2.50 range.
18 Q. And did you retain all of the guest
19   gratuities that were left for you in Boston?
20 A. No.
21 Q. What, if anything, did you do with the
22   gratuities you did not retain?
23 A. 10 percent to the bar -- bus, I'm sorry.
24   10 percent to the bus, 5 percent to the bar,
25   and 7 percent to management.

Page 691

VOLUME V
PAGES 691-926
EXHIBITS: Per index

AMERICAN ARBITRATION ASSOCIATION

AAA Case No.: 11 160 00217 03

DAVID BILBILIAN,           )
  Complainant,             )
                           )
v.                         )
                           )
MORTON'S OF CHICAGO/BOSTON,)
                           )
  Respondent.              )

BEFORE: Mark L. Irvings, Arbitrator

DAY FIVE OF ARBITRATION

JACKSON LEWIS LLP
75 Park Plaza
Boston, Massachusetts

Thursday, March 18, 2004
Commencing at 9:50 a.m.

Page 693

```
 1             I N D E X
 2  Testimony of: Direct Cross Redirect Recross
 3  RAUL ADORNO
      by Ms. Liss-Riordan
 4         694
      by Ms. Windholz    786
 5
    JANET HOFFMAN
 6   by Ms. Liss-Riordan
           813
 7
 8
 9
10           EXHIBITS
11
    NO. DESCRIPTION       For ID/In Evd.
12
    U   e-mail from Raul Adorno to    795
13      Janet Hoffman and Kevin Weinert
14  Excerpt from
    C-3
15   Letter from Attorney General's   821
     Office to Morton's, 12/7/00
16
    C-3 File from Attorney General's  847
17    Office
18  Excerpt from
    C-3
19   Cover Letter                     847
20  C-4 Complaint, 4/29/02            867
21  S   Typed notes of Janet Hoffmann 904
        re. phone conversation with
22      David Bilbilian, 11/19/02
23  C-16 Letter from Attorney General's 917
         Office to Morton's, 12/7/00
24
25
```

Page 692

APPEARANCES:
PYLE, ROME, LICHTEN & EHRENBERG, P.C.
BY: Shannon Liss-Riordan, Esq.
    M. Amy Carlin, Esq.
18 Tremont Street, Suite 500
(617) 367-7200
sliss@prle.com
Boston, Massachusetts 02108
On behalf of the Complainant.

JACKSON LEWIS LLP
BY: Elise M. Bloom, Esq.
    Diane Windholz Esq.
59 Maiden Lane
New York, New York 10038
(212) 545-4000
bloome@jacksonlewis.com
On behalf of the Respondent.

ALSO PRESENT:
David Bilbilian
Janet Hoffman

Page 694

```
 1              PROCEEDINGS
 2        RAUL ADORNO, Sworn.
 3              * * * * * * *
 4    DIRECT EXAMINATION BY MS. LISS-RIORDAN:
 5  Q. Good morning, Mr. Adorno.
 6  A. Good morning.
 7  Q. My name is Shannon Liss-Riordan, and I
 8     represent David Bilbilian in this matter.
 9     Now, you and I have never met, have we?
10  A. No.
11  Q. Are you employed by Morton's of Chicago?
12  A. Yes.
13  Q. And can you tell me what your position
14     currently is?
15  A. Sure. I'm the regional manager for the
16     Northeast.
17  Q. And how long have you worked at Morton's?
18  A. I've been with Morton's seven years, going
19     on eight years.
20  Q. And how long have you held your current
21     position of regional manager for the
22     Northeast?
23  A. As of February 2002.
24  Q. And can you tell me what other positions you
25     have held during your tenure with Morton's?
```

1 (Pages 691 to 694)

Page 695

1  A. Sure. I started my career with Morton's as
2  a bartender. I was a food and beverage
3  controller, assistant manager. I assisted
4  with corporate training. I was a general
5  manager --
6      THE ARBITRATOR: I'm sorry.
7  Assisted with corporate training?
8      THE WITNESS: Corporate training.
9  A. I was the general manager of our West Street
10  location and -- well, actually, I was in the
11  general manager role and then I became a
12  regional manager.
13 Q. When you say your West Street location,
14  where is that located?
15 A. That's New York City.
16 Q. So you've held the positions of, you said,
17  bartender, food and beverage controller.
18 A. Right.
19 Q. Corporate trainer.
20 A. Mm-hmm. Yes.
21 Q. And have you ever served as a general
22  manager of a restaurant?
23 A. Yes, I have.
24 Q. At what location?
25 A. At the West Street location and Toronto,

Page 696

1  Canada.
2  Q. And for some period of time you filled in as
3  a general manager at Boston. Is that right?
4  A. Yes, I did, interim.
5  Q. When was that?
6  A. That was 2001, the summer of 2001 for a
7  couple weeks.
8  Q. And can you tell me what Morton's locations
9  are within your Northeast region?
10 A. Okay. Currently, there's been some
11  realignment. When I was deposed, I was --
12  in my region I had Boston; Hartford;
13  Stanford, Connecticut; San Juan, Puerto
14  Rico; Hackensack, New Jersey. I believe
15  that's it. And Boston.
16 Q. And can you describe for me what your
17  responsibilities are with respect to those
18  Morton's restaurants within your region?
19 A. Sure. Basically day-to-day operations. I
20  would say financial management of the
21  restaurants, overseeing financial
22  responsibilities, and just making sure that
23  the concept is executed 100 percent in every
24  restaurant.
25 Q. And who do you report to at Morton's?

Page 697

1  A. I report to our vice president of
2  operations, East Coast.
3  Q. And who is that?
4  A. Currently, Chris Artinian. It was Kevin
5  Weinert.
6  Q. In 2002, was it Kevin Weinert?
7  A. Yes.
8  Q. I'm going to ask you a couple of questions
9  now about the pay structure for managers at
10  Morton's.
11 A. Sure.
12 Q. Putting aside the Boston location for a
13  moment, the general managers at the other
14  Morton's locations that are within your
15  region all receive some base pay ranging
16  from about $55,000 to $65,000. Is that
17  right?
18 A. Yes.
19 Q. I believe you said that last year at least
20  in Stanford the manager received about
21  $65,000 in base pay, the general manager?
22 A. Yes.
23 Q. And Hartford, $55,000 in base pay?
24 A. Yes.
25 Q. San Juan, $55,000 in base pay?

Page 698

1  A. Yes.
2  Q. Toronto, $60,000 in base pay?
3  A. Yes.
4  Q. And Hackensack, $65,000 in base pay. Is
5  that right?
6  A. Yes.
7  Q. Now, this base pay isn't the only
8  compensation these general managers receive
9  while they work at Morton's. Is that right?
10 A. Yes.
11 Q. They also receive a share of the tips from
12  the servers. Isn't that correct?
13 A. Yes, because they actively participate in
14  service.
15 Q. So the base pay is set at a level given the
16  expectation that they are also going to
17  receive additional compensation from
18  tip-outs from the servers. Is that right?
19 A. Yes.
20 Q. Now, putting aside Boston for a moment, at
21  all these other Morton's restaurants that
22  are your responsibility within the Northeast
23  region, servers are required to share their
24  tips with managers. Is that correct?
25 A. Yes.

2 (Pages 695 to 698)

Page 813

```
1        MS. BLOOM: Yes. We can look at
2    the testimony because it's pretty clear.
3        DIRECT EXAMINATION BY MS. LISS-RIORDAN:
4    Q. Good afternoon, Ms. Hoffmann.
5    A. Hi.
6    Q. Ms. Hoffmann, can you please state your full
7       name for the record?
8    A. Janet Ann Hoffmann.
9    Q. And are you currently employed by Morton's
10      of Chicago?
11   A. Yes, I am.
12   Q. Can you tell me what your position is?
13   A. Vice president of human resources and
14      organizational development.
15   Q. And how long have you held that position?
16   A. Since early this time last year.
17   Q. This time last year?
18   A. Mm-hmm.
19   Q. In 2003?
20   A. Yes.
21   Q. What was your position just prior to that?
22   A. Vice president of human resources.
23   Q. How long did you hold the position of vice
24      president of human resources?
25   A. From the time I started with the company in
```

Page 814

```
1       January of 1999.
2    Q. Until?
3    A. Until I was promoted.
4    Q. Which is this time last year?
5    A. Mm-hmm.
6    Q. I'm sorry. You have to say yes for the
7       court reporter.
8    A. Yes. I'm sorry.
9    Q. And, Ms. Hoffmann, can you describe for me
10      what your responsibilities were as the vice
11      president of human resources for Morton's?
12   A. Yes. I'm responsible for anything that
13      comes under the realm of a human resources
14      function for the company, which would
15      include things like hiring and recruiting,
16      maintaining employee records, training and
17      development, employee benefits, employee
18      relations. Those type of things.
19   Q. Was there anyone else who worked in human
20      resources for Morton's at the time you were
21      vice president or was it just yourself?
22   A. No, there's approximately 15 people in the
23      human resources department.
24   Q. And when you were the vice president for
25      human resources, did you oversee those
```

JANET HOFFMAN, Sworn.
* * * * * * *

THE ARBITRATOR: We can wait for Diane.

MS. BLOOM: That's okay.

MS. LISS-RIORDAN: We're not going to bring in Melanie Oliveira and Maura Daniel tomorrow. We'll wait and see whether we need them on rebuttal.

MS. BLOOM: And we looked at your stipulation. We're okay with everything except for one thing.

MS. LISS-RIORDAN: What's the one thing?

MS. BLOOM: I don't think that you accurately characterized the deposition, what he said at the deposition, and I have the pages for you and we can go over it.

MS. CARLIN: Do you have the other pages as well?

3.1 (Pages 811 to 814)

SPHERION REPORTING SERVICES

Page 815

1     15 people?
2     A. Yes.
3     Q. Where is your office based?
4     A. Chicago.
5     Q. And is that where it was based when you were
6        vice president of human resources?
7     A. Yes.
8     Q. And now I'm going to be asking you a number
9        of questions related to your
10       responsibilities with respect to Morton's
11       and focusing on the time period in which you
12       were vice president of human resources.
13       Okay?
14    A. Okay.
15    Q. Ms. Hoffmann, is it correct that Morton's
16       has 64 restaurants?
17    A. Today, yes.
18    Q. And would you agree that servers tipping out
19       managers is mandatory at most of those
20       restaurants?
21    A. Yes.
22    Q. Now, I understand that it's a voluntary
23       process in Louisville, Kentucky. Correct?
24    A. Yes.
25    Q. And in the Minneapolis Morton's restaurant

Page 816

1     there's no tipping out at all. Correct?
2     A. That's correct.
3     Q. And, now, putting aside Boston for a moment,
4        in all the other Morton's restaurants
5        waiters are required to tip out managers.
6        Correct?
7     A. There are two other restaurants where it is
8        a little bit different, and that's in our
9        Connecticut Avenue, Washington, DC
10       restaurant and also our Fifth Avenue
11       restaurant in New York.
12    Q. So putting aside these few, Louisville,
13       Minneapolis, DC, and New York and Boston for
14       a moment, at all the other restaurants the
15       percentage of the server's tip-out that goes
16       to managers varies from restaurant to
17       restaurant, but at all of these other
18       restaurants servers are required to share a
19       portion of their tips with managers. Is
20       that correct?
21    A. In all of the restaurants in the United
22       States, yes.
23    Q. So tipping out managers is mandatory in
24       approximately 50 to 60 Morton's restaurants?
25    A. Probably closer to 50.

Page 817

1     Q. And in those restaurants in which servers
2        are required to share their tips with
3        managers, the managers' pay is calculated
4        based upon the understanding that they will
5        be receiving a substantial portion of their
6        income from waiters' tips. Isn't that
7        right?
8     A. I wouldn't say substantial, no.
9     Q. But their salaries are set with an
10       understanding that they will be supplemented
11       by tip-outs from servers. Correct?
12    A. Yes.
13    Q. Now, you would agree, would you not, at
14       least that for some period of time tipping
15       out managers was mandatory in the Boston
16       Morton's as well. Correct?
17    A. I'm sorry. Could you just say that one more
18       time?
19    Q. Sure. At some point in time, would you
20       agree that having servers tip out managers
21       was mandatory in the Boston Morton's?
22    A. Yes, it was.
23    Q. Now, would you say that today servers
24       tipping out managers in the Boston Morton's
25       is mandatory or not mandatory?

Page 818

1     A. It's completely voluntary.
2     Q. And according to your testimony, when would
3        you say that tipping out management became
4        voluntary at Boston?
5     A. In January of 2001.
6     Q. Prior to January 2001 in the Boston
7        Morton's, if a waiter refused to tip out a
8        manager, a waiter could be disciplined for
9        that. Correct?
10    A. Yes.
11    Q. If a waiter refused to tip out a manager in
12       the Boston Morton's, you would agree that
13       prior to January 2001 the waiter could even
14       be terminated for that?
15    A. I don't know of a situation where they would
16       have been terminated for that, no.
17    Q. Were there ever any waiters who were
18       terminated for refusing to tip out
19       management at Morton's in Boston?
20    A. No.
21    Q. Were there ever any waiters who were
22       terminated for opposing the tipping policy
23       at the Morton's in Boston?
24    A. No.
25    Q. Now, you've received a number of claims or

32 (Pages 815 to 818)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

This is a court-authorized notice and is not a solicitation from a lawyer.
The Court has made no finding as to the merits of the case at this time.

If you are or were employed as a waitstaff employee by a Morton's of Chicago restaurant ("Morton's"), in any state in the U.S., a collective action lawsuit may affect your rights. You have the option to participate in this case, unless you have already participated in a similar case against Morton's that is pending or has been resolved.

A former employee (the "Plaintiff") has sued Morton's in federal court in Massachusetts, alleging that Morton's unlawfully paid waitstaff less than the minimum wage and deprived them of tip income by requiring them to "tip out" managers or other non-traditionally tipped employees. The case name is Mark Johnson, et al., v. Morton's Restaurant Group, Inc., Civil Action No. _____.

The Court has permitted the Plaintiff to send Notice to all similarly situated current and former employees so that they may be permitted to "opt in" to, or join, this lawsuit to assert their similar legal rights.

The Court has not yet decided whether Morton's has done anything wrong. There is no money available now, and there are no guarantees that there will be. However, you have the choice to assert your legal rights in this case. If you do, federal law prohibits Morton's from firing or discriminating against you for exercising your rights under the FLSA.

**YOUR LEGAL RIGHTS AND OPTIONS**

<u>Do Nothing</u>: By doing nothing, you retain your legal rights to bring a separate suit against Morton's regarding its tip policy. However, if money is later awarded in this case, you will not receive a share of the award.

<u>Ask to Be Included</u>: Complete the Opt-In Consent Form. By "opting in," you gain the possibility of getting money that may be awarded from a court order or negotiated in a settlement, but you give up the right to sue Morton's separately for the same claims brought in this lawsuit.

Your options are included in this Notice. To opt-in, you must complete the Opt-In Consent Form and forward it to the attorney designated in the Notice on or before _____.
If you have any questions or concerns, please contact:

Shannon Liss-Riordan, Esq.
Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C.
18 Tremont Street, Suite 500
Boston, MA 02108
(617) 367-7200
sliss@prle.com

OPT-IN CONSENT FORM
Mark Johnson, et al., v. Morton's Restaurant Group, Inc.,
Civil Action No: _____

Complete and Mail to:   Shannon Liss-Riordan, Esq.
Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C.
18 Tremont Street, Suite 500
Boston, MA 02108

Name: _____ S.S.# (optional): _____

Address: _____

Telephone: _____ (home) _____ (work) _____ (cell)

E-Mail: _____

CONSENT TO JOIN COLLECTIVE ACTION
Pursuant to the Fair Labor Standards Act, 29 U.S.C. § 216(b)

1. I consent and agree to pursue my claims arising out my employment at Morton's in connection with the above-referenced lawsuit.

2. I work/worked in the position(s) of _____
from on or about: _____ (month, year) to on or about _____ (month, year).

3. During the above time period, I paid a percentage of my tips to Morton's managers or other non-traditionally tipped employees.

4. I understand that this lawsuit is brought under the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. I hereby consent, agree, and "opt in" to become a plaintiff herein and to be bound by any judgment by the Court or any settlement of this action.

5. I hereby designate Shannon Liss-Riordan, Esq., of Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C., 18 Tremont Street, Suite 500, Boston, MA 02108, ("Plaintiffs' Counsel"), to represent me for all purposes in this action.

6. I also designate Mark Johnson, the collective action representative, as my agent to make decisions on my behalf concerning the litigation, including the method and manner of conducting this litigation, entering into settlement agreements, entering into an agreement with Plaintiffs' Counsel concerning attorneys' fees and costs (with the understanding that Plaintiffs' Counsel are being paid on a contingency fee basis, which means that if there is no recovery, there will be no attorneys' fees), and all other matters pertaining to this lawsuit.

Signature: _____  Date Signed: _____

Print Name: _____

**NOTE**
Statute of limitations concerns mandate that you return this form
as soon as possible in order to preserve your rights.