## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARK JOHNSON,<br>on behalf of himself and all others<br>similarly situated,<br><br>                Plaintiffs,<br><br>        v.<br><br>MORTON'S RESTAURANT GROUP, INC.,<br><br>                Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) | **CIVIL ACTION NO. 05-11058** *mlw* |

### <u>MOTION TO FACILITATE § 216(b) NOTICE</u>

Pursuant to Section 216(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S. §201 *et seq.*, Plaintiff Mark Johnson, on behalf of himself and all others similarly situated (collectively, "Plaintiffs"), respectfully requests that this Court allow Plaintiffs to notify potential class members of the existence of this lawsuit, thereby providing them with the opportunity to participate or "opt-in" to the pending litigation. Specifically, Plaintiffs request that the Court issue an Order (1) directing Defendant Morton's Restaurant Group, Inc. ("Morton's") to immediately provide Plaintiffs' counsel with a list of the names and contact information of all current and former waitstaff employees for whom Defendant has claimed a "tip credit" against the minimum wage employed in any state within the last three (3) years immediately preceding the filing of the Complaint (hereinafter, Plaintiffs may refer to this population as the "Potential Class Members"); and (2) authorizing the issuance of a Court-approved notice to the Potential Class Members so that they may be made aware of and can effectively assert their claims on a

timely basis. This Court should grant Plaintiffs' Motion because Plaintiffs have easily satisfied their burden to put forth a modest factual showing that similarly situated employees may exist.[1]

## I.   INTRODUCTION

Plaintiffs have filed this case as a collective action under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b). Plaintiffs seek to recover unpaid compensation, improperly withheld tips, liquidated damages, and attorneys' fees for all payroll periods during which they worked in Defendant's restaurants and were not properly compensated for their hours worked and not permitted to retain their tips. Plaintiffs seek to represent all similarly situated current and former employees of Defendant who were subject to Defendant's policy and practice of claiming an improper "tip credit," not paying employees the federal minimum wage, and improperly requiring employees to share their tips with non-traditionally tipped employees.

To participate in this case, similarly situated employees must "opt in" by filing a written consent to participate in this lawsuit. FLSA, 29 U.S.C. § 216(b). To decide whether to opt into the case, similarly situated employees need to be informed of the pendency of this case in a timely manner. Otherwise, the claims of many such employees may be barred by the FLSA statute of limitations.[2]

At issue is whether the plaintiffs are entitled to issuance of a Court-approved notice of the pending litigation to those employees who were subject to Defendant's policy and practice of

---

[1]   This Motion is supported by the Complaint in this matter, as well as the following Exhibits: Affidavit of Mark Johnson ("Johnson Aff.") (Exhibit 1); Sworn Testimony of David Bilbilian (Exhibit 2); Sworn Testimony of Raul Adorno (Morton's Northeast Regional Manager) (Exhibit 3); Sworn Testimony of Janet Hoffman (Vice President for Human Resources) (Exhibit 4); Proposed Notice to Potential Class Members (Exhibit 5).

[2]   Under the FLSA, the statute of limitations applicable in a given action is three years if, as Plaintiffs allege herein, the defendant's violations of the FLSA are willful. 29 U.S.C. § 255(a).

claiming an improper "tip credit," not paying employees the federal minimum wage, and improperly requiring employees to share their tips with non-traditionally tipped employees.

Plaintiffs are entitled to such a notice if they have shown a reasonable basis for their allegation that a class of similarly situated persons may exist. Plaintiffs can meet this burden by making a modest factual showing that Plaintiffs and the Potential Class Members were victims of a common policy or plan that violated the law. All that need be shown is that some identifiable factual or legal nexus binds together the various claims of the class members in such a way that hearing the claims together promotes judicial efficiency and comports with the broad remedial policies underlying the FLSA.

The merits of Plaintiffs' underlying claims for wages and tip income are not at issue in this Motion.

## II.    FACTUAL BACKGROUND

Defendant Morton's of Chicago, Inc. is the largest company-owned steakhouse group in the United States, with more than 60 Morton's steakhouse locations throughout the United States. *See* Testimony of Janet Hoffman (Vice President for Human Resources) (Exhibit 4), at 815; http://www.mortons.com. Plaintiffs worked for Defendant as wait staff employees within the past three years. Complaint ¶ 2; Johnson Aff. (Exhibit 1), ¶ 2. Defendant has had a policy and practice of claiming an improper "tip credit," not paying employees the full federal minimum wage, and improperly requiring employees to share their tips with non-traditionally tipped employees, including managers. Complaint, ¶¶ 1, 6-9; Johnson Aff., ¶¶ 3-5.

This policy regarding employees tipping out managers is a national policy, which Morton's has admitted exists in its restaurants throughout the United States, with a few limited

3

exceptions. See Sworn Testimony of Raul Adorno (Morton's Northeast Regional Manager) (Exhibit 3), at 696-98 (general managers at all Morton's restaurants in the Northeast Region [including Hartford, Stanford, Connecticut, San Juan, Hackensack, and Boston] receive compensation in the form of a share of servers' tips); Sworn Testimony of Janet Hoffman (Vice President for Human Resources) (Exhibit 4), at 815-16 (admitting that servers are required to tip out managers in most [at least 50] Morton's restaurants in the United States). See also Sworn Testimony of David Bilbilian (Exhibit 2), at 478, 486 (Morton's servers gave 10 percent of their tips to management in West Palm Beach and 7 percent of their tips to management in Boston).

As asserted in the Complaint and as borne out by Plaintiffs' Exhibits attached hereto, Defendant has failed to pay its waitstaff employees the required federal minimum wage and has expected waiters to "tip out" nontraditionally tipped employees, while taking an improper "tip credit" against the minimum wage. See Exhibits 1-4 (attached hereto). Defendant has also failed to satisfy the notice requirement of the FLSA that is required in order for it to take the tip credit. See Complaint, ¶ 10; Johnson Aff., ¶ 6. These exhibits demonstrate clearly and concisely that the unlawful pay practices at issue in this case are pervasive, widespread, and substantially similar throughout Defendant's work force. Id.

Plaintiffs claim entitlement to unpaid minimum wage compensation, tips they have been improperly required to hand over to nontraditionally tipped employees, and liquidated damages for all payroll periods during which they worked in Defendant's restaurants.

4

### III.    DISCUSSION

1.    <u>The District Court is Authorized to Issue Notice to the Potential Opt-Ins</u>

The FLSA allows an employee to bring an action on his or her own behalf and on behalf

of all others "similarly situated." 29 U.S.C. §216(b). However, putative participants in the

FLSA collective action must affirmatively "opt-in" to be covered by the suit. <u>Id.</u>; <u>Kane v. Gage</u>

<u>Merchandising Services, Inc.</u>, 138 F.Supp.2d 212, 214 (D. Mass. 2001); <u>Hipp v. Liberty National</u>

<u>Life insurance Co.</u>, 252 F.3d 1208, 1217 (11th Cir. 2001). The statute of limitations for each

putative potential class member is not tolled until he or she individually opts into the litigation.

29 U.S.C. §216(b); <u>Partlow v. Jewish Orphans' Home of Southern California, Inc.</u>, 645 F.2d 757,

759 (9th Cir. 1981) (abrogated on other grounds by <u>Hoffman-La Roche Inc. v. Richard Sperling</u>

<u>et al.</u>, 493 U.S. 165 (1989)).  To address the problem of FLSA rights made stale through lack of

knowledge, the Supreme Court has held that courts may facilitate the issuance of a notice

informing potential opt-in plaintiffs of the pending FLSA collective action. <u>Kane v. Gage</u>, 138

F.Supp.2d at 214 (<u>citing Hoffman La Roche Inc.</u>, 493 U.S. at 170).  Court approval and

facilitation of notice serve the goals of "avoiding a multiplicity of duplicative suits and setting

cutoff dates to expedite disposition of the action." <u>Hoffman-La Roche</u>, 493 U.S. at 171.[3]

---

[3]    In <u>Pirrone v. North Hotel Associates</u>, 108 F.R.D. 78, 82 (E.D. Pa. 1985), for example, the court held that notice to all similarly situated employees was appropriate "in light of the broad remedial purpose of the FLSA, the explicit provision in the Act for representative actions, the practical realities of management of class actions, and the courts' interest in avoiding multiplicity of lawsuits." In so holding, the court recognized that "the FLSA was enacted to protect employees . . . The class action procedure, however, would have little or no significance if notice was not permitted in some form." <u>Id.</u> 108 F.R.D. at 82. <u>See also Lambert v. Ackerley</u>, 180 F.3d 997, 1003 (9th Cir. 1999), <u>cert. denied</u>, 528 U.S. 1116 (2000) (noting that "[t]he FLSA is remedial and humanitarian in purpose. . . Such a statute must not be interpreted or applied in a narrow, grudging manner") (citations omitted).

2.    Issuance of Notice is Appropriate, As Plaintiffs Meet the Similarly
Situated Standard

a.  *Plaintiffs need only make a modest factual showing that similarly
situated employees may exist.*

For an opt-in class to be created under Section 216(b) and for notice to issue, Plaintiffs

must demonstrate that similarly situated potential class members exist.  Grayson v. K Mart

Corp., 79 F.3d 1086, 1096 (11th Cir. 1996), cert. denied, 519 U.S. 982 (1996); Reeves v. Alliant

Techsystems, Inc., 77 F.Supp.2d 242 (D.R.I. 1999).  Neither the FLSA nor the applicable

regulations define the term "similarly situated."  However, the majority of courts, as well as

recent decisions in this circuit, agree that certification should be administered using the two-step

approach articulated by the Fifth Circuit in Mooney v. Aramco, 54 F.3d 1207 (5th Cir. 1995).

See Kane v. Gage, 138 F.Supp.2d at 214.  Under this two-step approach, the court first

preliminarily certifies a collective action, orders notice to the potential opt-ins based on a modest

evidentiary showing, and permits an opt-in period.  During this "'notice stage,' the court usually

relies 'only on the pleadings and any affidavits which have been submitted' ... [and] some courts

have held that, at the 'notice' stage, plaintiffs need only make substantial allegations that the

putative class members were subject to a single decision, policy, or plan that violated the law."

Id., citing Mooney, 54 F.3d at 1214.  Second, after discovery, the court reviews the preliminary

certification and determines whether the case should proceed as a collective action.  Id.  At both

stages, the court assesses whether plaintiffs and the potential opt-ins are similarly situated.  At

the first stage, however, "this determination is made using a fairly lenient standard, and typically

results in 'conditional certification' of a representative class." Mooney, 54 F.3d at 1213-14.[4]

Plaintiffs need not be identical to the putative class members, but need only be similar. Grayson,

79 F.3d at 1097.[5]

It is well settled that the preliminary notice motion is not a ruling on the merits of the

Plaintiffs' claims, and that courts should not inquire into the merits of the case at the "notice"

stage. Grayson, 79 F.3d at 1099 n.17; Hyman v. First Union Corp., 982 F.Supp. 1, 3-5 (D.D.C.

1997); Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974).

> b.  *Plaintiffs have easily met their burden of establishing that similarly*
> *situated employees may exist and are therefore entitled to collective*
> *action notice*

A plaintiff may demonstrate that similarly situated class members may exist by making a

"modest factual showing sufficient to demonstrate that [plaintiffs] and potential plaintiffs

together were the victims of a common policy or plan that violated the law." Hoffman v. Sbarro,

Inc., 982 F.Supp. 249, 261 (S.D.N.Y. 1997). All a plaintiff needs to show "is that some

identifiable factual or legal nexus binds together the various claims of the class members in a

way that hearing the claims together promotes judicial efficiency and comports with the broad

remedial policies underlying the FLSA." Ballaris v. Wacker Siltronic Corp., 2001 U.S. Dist.

LEXIS 13354, 144 Lab. Case (CCH) P34351 (D. Or. Aug. 24, 2001), citing Wertheim v. State of

Arizona, 1993 WL 603552 (D.Ariz. 1993). Here, the alleged violations have been suffered by

---

[4]     The standard at the 'notice' stage "is considerably 'less stringent' than the proof required pursuant to Fed.
R. Civ. P. 20(a) for joinder or Fed. R. Civ. P. 23 for class certification." Grayson, 79 F.3d at 1096.

[5]     Indeed, allowing early notice and full participation by the opt-ins "assures that the full 'similarly situated'
decision is informed, efficiently reached, and conclusive." Sperling v. Hoffman-LaRoche, 118 F.R.D. 392, 406
(D.N.J. 1998). Once the notice and opt-in period is complete, the Court will have the benefit of knowing the actual
makeup of the collective action. Thus, early notice will help the court to manage the case because it can "ascertain
the contours of the action at the outset." Hoffman-La Roche, 493 U.S. at 172-73.

Defendant's waitstaff employees throughout the nation. See Complaint, ¶¶ 1, 6-10; Exhibits 1-4. These violations arise from a company-wide policy or practice of Defendant and, as such, establish a basic factual scenario experienced not only by the current named plaintiff, but also by each Potential Class Member.

Collective action authorization and notice to the class is well warranted here, as Plaintiffs have more than demonstrated a "reasonable basis" for the class allegations. See Grayson, 79 F.3d at 1097. In Kane v. Gage, this Court held that affidavits suggesting "that the Defendants had a policy of treating at least some of a discrete class of employees" as subject to an exception to the usual requirements of the FLSA was a sufficient showing "to determine that a 'similarly situated' group of potential plaintiffs exist[ed] given the adopted lenient standard for court-facilitated notice" and granted conditional certification. 138 F.Supp.2d at 215. In this case, Plaintiffs have provided detailed allegations in their Complaint and have amply supported them with evidence, including an affidavit from the named plaintiff and sworn testimony from Morton's management. Such a showing more than satisfies the "lenient" standard for collective action notice. Id.; see also Mooney, 54 F.3d at 1213-14. The pleadings and affidavits show that Defendant had a policy of claiming an improper "tip credit," not paying employees the federal minimum wage, and improperly requiring employees to share their tips with non-traditionally tipped employees, including managers, and suffice to establish a reasonable basis for the allegation that a class of similarly situated persons may exist. Id. See also Grayson, 79 F.3d at 1097; Zhao v. Benihana, 2001 U.S. Dist. LEXIS 10678 (S.D.N.Y. May 7, 2001) (one affidavit based on plaintiff's "best knowledge" sufficient); Allen v. Marshall Field & Co., 93 F.R.D. 438,

442-45 (N.D. Ill. 1982) (allegations in complaint sufficient for issuance of notice to putative

class).

        3.     Notice Should Be Expedited Due to the Running of the Statute of
                 Limitations

Notice to the putative class should be expedited in this action in order to prevent the

wasting of the employees' claims due to the running of the FLSA statute of limitations. The

employees' claims are governed by a three-year statute of limitations period (or only two years if

the plaintiffs are not successful in proving that the violations are "willful"). 29 U.S.C. §256(a).

The statute of limitations is generally not tolled for any individual class member until that

individual has filed a written consent form with the Court. 29 C.F.R. §790.21(b)(2); Grayson, 79

F.3d at 1105-06.

Defendant has denied its waitstaff employees minimum wage and tip income for well

more than three years. Consequently, the statute of limitations is potentially diminishing the

value of the employees' claims with each day that passes. The information contained in the

proposed notice (Exhibit 5) should therefore be issued as soon as possible to allow these

employees to act to protect their interests. Without notice, they are unaware of the pendency of

the action and their right to opt-in and are powerless to prevent their claims from wasting away.

Moreover, as many of the Potential Class Members no longer work for Defendant, their

whereabouts will be increasingly difficult to track, and evidence may be lost with the passing of

time. Therefore, notice should be expedited in this action to the maximum extent feasible, and

should be sent to all waitstaff employees employed by Defendant during the three-year potential

liability period. See Belcher v. Shoney's, Inc, 927 F.Supp. 249, 252 (M.D. Tenn. 1996)

(ordering notice to all employees who were employed within three-year limitations period);

Herrera v  Unified Mgmt, 2000 U.S. Dist. LEXIS, 12406 (N.D. Ill. 2000).

> ### 4.    The Proposed Notice is Fair and Adequate

A collective action depends "on employees receiving accurate and timely notice

concerning the pendency of the collective action, so that they can make informed decisions about

whether to participate." Hoffman-La Roche Inc., 493 U.S. at 170.  Use of a Court-approved

notice prevents "misleading communications." Id. at 172.  Plaintiffs' proposed notice to

potential opt-ins is "timely, accurate and informative," as required. Id.; see Proposed Notice to

Potential Class Members, attached hereto as Exhibit 5.  It provides notice of the pendency of the

action and of the opportunity to opt-in.  Plaintiffs' legal claims are accurately described.  The

proposed notice advises potential opt-ins that they are not required to participate.  The notice also

provides clear instructions on how to opt-in, and accurately states the prohibitions against

retaliation or discrimination for participation in an FLSA action. See 29 U.S.C. §215(a)(3).  The

notice also indicates that an employee who has already participated as a plaintiff in a similar case

that is pending or has already resolved may not opt-in to this case.

> ### 5.    The Proposed Limited Discovery is Essential to Ensure Timely Notice

Discovery of a mailing list for class members is a routine component of notice in

collective actions. Hoffman-LaRoche, 493 U.S. at 1470 ("District Court was correct to permit

discovery of the names and addresses..."); Grayson, 79 F.3d at 1111 (ordering production of

mailing list); Belcher, 927 F.Supp. at 252 (same).  Indeed, such a mailing list is essential to

timely notice. Hoffman- LaRoche, 493 U.S. at 170 ("timely notice" required).  Therefore, this

Court should order Defendant to produce a computer-readable data file containing the names and

contact information (current or last known addresses and telephone numbers) for all Morton's

waitstaff employees employed anywhere in the United States within the three years preceding

the filing of this action.

## IV.    CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' Motion to facilitate § 216(b)

Notice.

Dated:  May 20, 2005

Respectfully submitted,

Shannon Liss-Riordan, BBO #640716
PYLE, ROME, LICHTEN, EHRENBERG
        & LISS-RIORDAN, P.C.
18 Tremont Street, Ste. 500
Boston, MA 02108
(617) 367-7200



**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| MARK JOHNSON,<br>on behalf of himself and all others<br>similarly situated,<br><br>            Plaintiffs,<br><br>        v.<br><br>MORTON'S RESTAURANT GROUP, INC.,<br><br>            Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF MARK JOHNSON

I, Mark Johnson, hereby declare under penalty of perjury under the laws of the United States that the following is true and correct:

1.     My name is Mark Johnson. I reside in Cambridge, Massachusetts. I am over the age of 18 and otherwise competent to testify. Unless expressly stated otherwise, the statements made in this declaration are based upon my personal knowledge.

2.     I am a named Plaintiff in the above-referenced matter. I was employed as a server for the Morton's restaurant located at One Exeter Plaza in Boston, Massachusetts, from approximately May 1988 until July 2002.

3.     Throughout my employment with Morton's, I, like all servers, received a base pay at the "service minimum wage," which is less than the standard federal minimum wage. At the end of my employment, this rate was $2.63 per hour. I also received tips from customers, but Morton's did not permit me to retain all my tips.

4.     Instead, under a formula devised by management, tipped employees, including myself, were expected to hand over to various other employees percentages of the tips we

received from customers. Under this "tip-out" formula, we paid 7% of our tips to management. This was the case throughout my entire employment with Morton's.

5.      The managers whom we were expected to tip out included the General Manager as well as other managers.

6.      Morton's did not, at any time during my employment there, explain that it intended to take a "tip credit" against the minimum wage for servers, that it intended to treat tips as satisfying part of its minimum wage obligation, nor did it explain anything about what a "tip credit" is.

7.      During and since my employment with Morton's, other servers expressed to me dissatisfaction with the company's requirement that servers share their tips with managers among other employees. These servers have included servers outside of Massachusetts, including friends in California. I believe that many current and former Morton's servers would be interested in participating in this litigation if given notice of an opportunity to opt-in to the case.

Signed under pains and penalties of perjury, this __19__ day of May 2005.

Mark Johnson

2

VOLUME IV
PAGES 470-690
EXHIBITS: Per Index

AMERICAN ARBITRATION ASSOCIATION

AAA Case No.: 11 160 00217 03

DAVID BILBILIAN,            )
    Complainant,        )
                        )
    v.                  )
                        )
MORTON'S OF CHICAGO/BOSTON, )
INC.,                       )
    Respondent.         )

BEFORE:   Mark L. Irvings, Arbitrator

DAY FOUR OF ARBITRATION

PYLE, ROME, LICHTEN & EHRENBERG, P.C.
18 Tremont Street
Boston, Massachusetts

Tuesday, March 9, 2004
Commencing at 10 a.m.

Page 471

1  APPEARANCES:
2  PYLE, ROME, LICHTEN & EHRENBERG, P.C.
3    BY: Shannon Liss-Riordan, Esq.
4       M. Amy Carlin, Esq.
5    18 Tremont Street, Suite 500
6    Boston, Massachusetts 02108
7    (617) 367-7200
8    sliss@pre.com
9    On behalf of the Complainant.
10
11  JACKSON LEWIS LLP
12    BY: Elise M. Bloom, Esq.
13       Diane Windholz, Esq.
14    59 Maiden Lane
15    New York, New York 10038
16    (212) 545-4000
17    bloome@jacksonlewis.com
18    On behalf of the Respondent.
19
20  ALSO PRESENT:
21    Janet Hoffman
22
23
24
25

Page 473

1        E X H I B I T S
          (cont'd)
2  NO.  DESCRIPTION          For ID/In Evd.
3   Q   Counseling Form with attachments     635
4   B   David Bilbilian's Application         663
        for Employment at Morton's,
5       7/2/96
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 472

1              I N D E X
2  Testimony of:  Direct  Cross  Redirect  Recross
3  DAVID BILBILIAN
   by Ms. Liss-Riordan
4              474         664
   by Ms. Bloom      564         684
5
6
7
8
              E X H I B I T S
9
   NO.  DESCRIPTION          For ID/In Evd.
10
   C-8  Recognition Form for David       514
11      Bilbilian, 8/14/02
12  J   Counseling Form, 6/6/02      519
13  M   Counseling Form, 10/18/02    522
14  N   Counseling Form, 11/6/02     525
15  P   Counseling Form, 11/9/02     529
16  C-14 e-mail from Eric Klein,      564
        11/22/02
17
   C-15  W-2 Forms for David Bilbilian   564
18      for 2001 and 2002
19  F   Disciplinary Action Report,   585
        1/22/01
20
   G   Counseling Form, 5/30/01       590
21
   H   Counseling Form, 10/19/01      591
22
   I   Counseling Form, 12/20/01      592
23
   K   Counseling Form, 8/3/02        601
24
   O   Counseling Form, 11/9/02       612
25

Page 474

1           P R O C E E D I N G S
2           DAVID BILBILIAN, Sworn.
3           * * * * * * *
4  DIRECT EXAMINATION BY MS. LISS-RIORDAN
5  Q. Good morning, Mr. Bilbilian.
6  A. Good morning.
7  Q. I'm going to ask you first just to tell us a
8     little bit about yourself.  Where were you
9     born?
10  A. Worcester, Massachusetts.
11  Q. Have you lived in Massachusetts your whole
12     life?
13  A. Also Florida.
14  Q. Are you married?
15  A. Yes.
16  Q. Do you have kids?
17  A. Yes, two.
18  Q. Boys? Girls?
19  A. Two boys.  Three and two.
20  Q. Can you tell me when you were born?
21  A. June 8th, 1968.
22  Q. And, Mr. Bilbilian, at some point in your
23     life did you begin working as a waiter?
24  A. Yes, I did.
25  Q. Where did you first start working as a

Page 475

waiter?

A. At the Top of the Tower restaurant at the Boca Raton Resort & Club.

Q. So this is when you were living in Florida.

A. Yes.

Q. How long did you live in Florida for?

A. Almost five years.

Q. And other than those five years in Florida, have you lived in Massachusetts for the rest of your life?

A. Yes.

Q. At some point did you begin working for Morton's of Chicago?

A. Yes.

Q. When did you start working for Morton's of Chicago?

A. August 8th, 1996.

Q. And where was it that you began working for Morton's in August 1996?

A. West Palm Beach, Florida.

Q. What was your position at Morton's in West Palm Beach?

A. Server.

Q. And can you describe for us how you were compensated as a server at Morton's in West

Page 476

Palm Beach?

A. Guest gratuities --

MS. BLOOM: Objection. Relevance. There's no issue in the case about what did or did not go on in West Palm Beach. And even to the extent his retaliation claim is based on what was going on here in Massachusetts, that's premised on a state law in Massachusetts. So the compensation structure for it has nothing to do with this case.

MS. LISS-RIORDAN: I'm only going to be asking a couple of questions. And part of our case is that Morton's has a nationwide system for how its servers and its managers are compensated. I'm only going to ask about two questions about Florida.

MS. BLOOM: This has nothing to do with any kind of a nationwide issue. There's no federal claim in this case. There's never been any federal claim. Even in the wage case we were talking about an alleged violation of the Massachusetts state statute. So what does or does not go on in

Page 477

1  Florida has absolutely no bearing on
2  Mr. Bilbilian's case.
3          THE ARBITRATOR: It's potentially
4  relevant as to whether there was a national
5  policy or a national practice for wage
6  compensation and arguably perfectly
7  appropriate in some cases, potentially
8  inappropriate in others. So go ahead.
9  Q. Mr. Bilbilian, can you describe how you were
10  compensated as a waiter at Morton's in West
11  Palm Beach?
12  A. Guest gratuities, and the hourly wage was
13  two dollars and I think somewhere around
14  fifty cents.
15  Q. And did you retain all the guest gratuities
16  that were left for you when you worked at
17  West Palm Beach?
18  A. No.
19  Q. What, if anything, happened to some of your
20  gratuities?
21  A. We gave --
22          MS. BLOOM: Same objection.
23  Relevance.
24          THE ARBITRATOR: That's fine. It's
25  standing.

Page 478

1  A. We gave 10 percent to the bus staff,
2  5 percent to the bar staff and 10 percent to
3  management.
4          THE ARBITRATOR: And how much to
5  management?
6          THE WITNESS: 10 percent.
7  Q. How did you know to give 10 percent of your
8  gratuities to management?
9  A. That's how I was trained. And also training
10  cards. We did a monetary breakdown at the
11  end of the night, and the percentage you
12  were told by your trainer as to what you
13  left.
14  Q. How did you like working for Morton's in
15  Florida?
16  A. Loved it.
17  Q. How did you get along with the managers
18  there?
19  A. Very well.
20  Q. And your coworkers, how were your
21  relationships with your coworkers?
22  A. Excellent. We all had a great
23  relationship. I actually still have a great
24  relationship with most of them.
25  Q. And customers, can you describe how you got

3 (Pages 475 to 478)

Page 483

Boston Morton's?

MS. BLOOM: Objection. Lack of foundation.

THE ARBITRATOR: What was he told and what did he do? Let's get him to Boston.

Q. Can you tell me more about what your manager told you when you asked if you could transfer to Boston?

A. Well, I can actually tell you I was present in the office when the general manager made the phone call to the general manager in Boston, and he was very complimentary of myself.

And after that phone call, we had waited for a return call which we received. And then I transferred and came to Boston.

Q. Were you excited to come to -- or how did you feel about being able to transfer?

A. Very excited.

Q. And why were you excited about transferring to Boston?

(Brief interruption.)

MS. BLOOM: Can I have the question?

Page 484

(Pending question read by reporter.)

A. First and foremost would be my family. And I was excited to be back home.

Q. And in your understanding, how did working at the Morton's in Boston compare financially with working at Morton's in Florida?

A. Much more money.

Q. And why was that?

A. Well, Florida was so seasonal that you really only had five months of busy service. And the Boston store was -- we had a lot of corporate expense accounts circulating through the restaurant, and it was just much more money in the City of Boston.

Q. So when did you begin working at Morton's in Boston?

A. Somewhere around September 10th of '98.

Q. 1998?

A. Yes.

Q. And when you came to the Morton's in Boston, how did you like working there?

A. Loved it.

Page 485

1  Q. Can you tell me a little bit about how you
2     got along with your managers when you first
3     started at Morton's in Boston?
4  A. Very well. They were very complimentary.
5     They seemed very happy that I was there.
6  Q. How was your relationship with your
7     coworkers in Boston when you first started?
8  A. Very good. Very good. Pretty much as soon
9     as I had been settled, I had pretty much
10    made it a point that I helped everyone. So
11    I think for that, a lot of the newer servers
12    liked me and a lot of the senior servers
13    respected me.
14 Q. And can you tell us a bit about your
15    relationships with customers at the Boston
16    Morton's? How was it?
17 A. Very good. Very good. I had a very good
18    following. And I would get very frequent
19    call parties, people that would call up and
20    ask if I was working or ask if they could be
21    in my station or what nights I would be
22    working.
23 Q. And how were the gratuities that you
24    received from customers at the Boston
25    Morton's?

Page 486

1  A. Excellent. At certain points we had
2     actually documented gratuities, and I feel
3     comfortable in saying that I was probably at
4     the top of the list, if not the top three
5     for gratuities.
6  Q. You were near the top in terms of
7     percentages --
8  A. Percentages.
9  Q. -- of gratuities left?
10 A. Yes, percentages.
11 Q. When you began working at the Morton's in
12    Boston, can you tell me how you were
13    compensated?
14 A. Guest gratuity.
15 Q. Did you receive a base pay from Morton's?
16 A. $2.63 I think it was right around that time
17    in '98. Somewhere in the $2.50 range.
18 Q. And did you retain all of the guest
19    gratuities that were left for you in Boston?
20 A. No.
21 Q. What, if anything, did you do with the
22    gratuities you did not retain?
23 A. 10 percent to the bar -- bus, I'm sorry.
24    10 percent to the bus, 5 percent to the bar,
25    and 7 percent to management.

Page 691

VOLUME V
PAGES 691-926
EXHIBITS: Par Index

AMERICAN ARBITRATION ASSOCIATION

AAA Case No.: 11 160 00217 03

DAVID BILBILIAN,          )
Complainant,          )
                         )
                         )
                         )
MORTON'S OF CHICAGO/BOSTON, )
                         )
Respondent.          )

BEFORE: Mark L. Irvings, Arbitrator

DAY FIVE OF ARBITRATION

JACKSON LEWIS LLP
75 Park Plaza
Boston, Massachusetts

Thursday, March 18, 2004
Commencing at 9:50 a.m.

---

Page 693

INDEX

Testimony of:  Direct  Cross  Redirect  Recross
RAUL ADORNO
  by Ms. Liss-Riordan
          694
  by Ms. Windholz    786

JANET HOFFMAN
  by Ms. Liss-Riordan
          813

EXHIBITS

NO.   DESCRIPTION          For ID/In Evd.

U   e-mail from Raul Adorno to      795
    Janet Hoffman and Kevin Weinert
    Excerpt from
    C-3
    Letter from Attorney General's    821
    Office to Morton's, 12/7/00

C-3  File from Attorney General's   847
     Office
    Excerpt from
    C-3
    Cover Letter          847
C-4  Complaint, 4/29/02          867
S   Typed notes of Janet Hoffmann    904
    re. phone conversation with
    David Bilbilian, 11/19/02
C-16  Letter from Attorney General's   917
     Office to Morton's, 12/7/00

---

Page 692

APPEARANCES:
PYLE, ROME, LICHTEN & EHRENBERG, P.C.
BY: Shannon List-Riordan, Esq.
    M. Amy Carlin, Esq.
18 Tremont Street  Suite 500
(617) 367-7200
sliss@prle.com
Boston, Massachusetts 02108
On behalf of the Complainant.

JACKSON LEWIS LLP
BY: Elise M. Bloom, Esq.
    Diane Windholz, Esq.
59 Maiden Lane
New York, New York 10038
(212) 545-4000
bloome@jacksonlewis.com
On behalf of the Respondent.

ALSO PRESENT:
David Bilbilian
Janet Hoffman

---

Page 694

       PROCEEDINGS
       RAUL ADORNO, Sworn.
       * * * * * * *
1    DIRECT EXAMINATION BY MS. LISS-RIORDAN:
5  Q.  Good morning, Mr. Adorno.
6  A.  Good morning.
7  Q.  My name is Shannon Liss-Riordan, and I
8      represent David Bilbilian in this matter.
9      Now, you and I have never met, have we?
10 A.  No.
11 Q.  Are you employed by Morton's of Chicago?
12 A.  Yes.
13 Q.  And can you tell me what your position
14     currently is?
15 A.  Sure. I'm the regional manager for the
16     Northeast.
17 Q.  And how long have you worked at Morton's?
18 A.  I've been with Morton's seven years, going
19     on eight years.
20 Q.  And how long have you held your current
21     position of regional manager for the
22     Northeast?
23 A.  As of February 2002.
24 Q.  And can you tell me what other positions you
25     have held during your tenure with Morton's?

Page 695

1  A. Sure. I started my career with Morton's as
2     a bartender. I was a food and beverage
3     controller, assistant manager. I assisted
4     with corporate training. I was a general
5     manager --
6            THE ARBITRATOR: I'm sorry.
7     Assisted with corporate training?
8            THE WITNESS: Corporate training.
9  A. I was the general manager of our West Street
10    location and -- well, actually, I was in the
11    general manager role and then I became a
12    regional manager.
13 Q. When you say your West Street location,
14    where is that located?
15 A. That's New York City.
16 Q. So you've held the positions of, you said,
17    bartender, food and beverage controller.
18 A. Right.
19 Q. Corporate trainer.
20 A. Mm-hmm. Yes.
21 Q. And have you ever served as a general
22    manager of a restaurant?
23 A. Yes, I have
24 Q. At what location?
25 A. At the West Street location and Toronto,

Page 696

1     Canada.
2  Q. And for some period of time you filled in as
3     a general manager at Boston. Is that right?
4  A. Yes, I did, interim.
5  Q. When was that?
6  A. That was 2001, the summer of 2001 for a
7     couple weeks.
8  Q. And can you tell me what Morton's locations
9     are within your Northeast region?
10 A. Okay. Currently, there's been some
11    realignment. When I was deposed, I was --
12    in my region I had Boston; Hartford;
13    Stanford, Connecticut; San Juan, Puerto
14    Rico; Hackensack, New Jersey. I believe
15    that's it. And Boston.
16 Q. And can you describe for me what your
17    responsibilities are with respect to those
18    Morton's restaurants within your region?
19 A. Sure. Basically day-to-day operations. I
20    would say financial management of the
21    restaurants, overseeing financial
22    responsibilities, and just making sure that
23    the concept is executed 100 percent in every
24    restaurant.
25 Q. And who do you report to at Morton's?

Page 697

1  A. I report to our vice president of
2     operations, East Coast.
3  Q. And who is that?
4  A. Currently, Chris Artinian. It was Kevin
5     Weinert.
6  Q. In 2002, was it Kevin Weinert?
7  A. Yes.
8  Q. I'm going to ask you a couple of questions
9     now about the pay structure for managers at
10    Morton's.
11 A. Sure.
12 Q. Putting aside the Boston location for a
13    moment, the general managers at the other
14    Morton's locations that are within your
15    region all receive some base pay ranging
16    from about $55,000 to $65,000. Is that
17    right?
18 A. Yes.
19 Q. I believe you said that last year at least
20    in Stanford the manager received about
21    $65,000 in base pay, the general manager?
22 A. Yes.
23 Q. And Hartford, $55,000 in base pay?
24 A. Yes.
25 Q. San Juan, $55,000 in base pay?

Page 698

1  A. Yes.
2  Q. Toronto, $60,000 in base pay?
3  A. Yes.
4  Q. And Hackensack, $65,000 in base pay. Is
5     that right?
6  A. Yes.
7  Q. Now, this base pay isn't the only
8     compensation these general managers receive
9     while they work at Morton's. Is that right?
10 A. Yes.
11 Q. They also receive a share of the tips from
12    the servers. Isn't that correct?
13 A. Yes, because they actively participate in
14    service.
15 Q. So the base pay is set at a level given the
16    expectation that they are also going to
17    receive additional compensation from
18    tip-outs from the servers. Is that right?
19 A. Yes.
20 Q. Now, putting aside Boston for a moment, at
21    all these other Morton's restaurants that
22    are your responsibility within the Northeast
23    region, servers are required to share their
24    tips with managers. Is that correct?
25 A. Yes.

2 (Pages 695 to 698)

Page 813

1         MS. BLOOM: Yes. We can look at
2     the testimony because it's pretty clear.
3         DIRECT EXAMINATION BY MS. LISS-RIORDAN:
4     Q. Good afternoon, Ms. Hoffmann.
5     A. Hi.
6     Q. Ms. Hoffmann, can you please state your full
7         name for the record?
8     A. Janet Ann Hoffmann.
9     Q. And are you currently employed by Morton's
10        of Chicago?
11    A. Yes, I am.
12    Q. Can you tell me what your position is?
13    A. Vice president of human resources and
14        organizational development.
15    Q. And how long have you held that position?
16    A. Since early this time last year.
17    Q. This time last year?
18    A. Mm-hmm.
19    Q. In 2003?
20    A. Yes.
21    Q. What was your position just prior to that?
22    A. Vice president of human resources.
23    Q. How long did you hold the position of vice
24        president of human resources?
25    A. From the time I started with the company in

Page 814

1         January of 1999.
2     Q. Until?
3     A. Until I was promoted.
4     Q. Which is this time last year?
5     A. Mm-hmm.
6     Q. I'm sorry. You have to say yes for the
7         court reporter.
8     A. Yes. I'm sorry.
9     Q. And, Ms. Hoffmann, can you describe for me
10        what your responsibilities were as the vice
11        president of human resources for Morton's?
12    A. Yes. I'm responsible for anything that
13        comes under the realm of a human resources
14        function for the company, which would
15        include things like hiring and recruiting,
16        maintaining employee records, training and
17        development, employee benefits, employee
18        relations. Those type of things.
19    Q. Was there anyone else who worked in human
20        resources for Morton's at the time you were
21        vice president or was it just yourself?
22    A. No, there's approximately 15 people in the
23        human resources department.
24    Q. And when you were the vice president for
25        human resources, did you oversee those

JANET HOFFMAN, Sworn.
* * * * * * *

THE ARBITRATOR: We can wait for
Diane.

MS. BLOOM: That's okay.

MS. LISS-RIORDAN: We're not going
to bring in Melanie Oliveira and Maura
Daniel tomorrow. We'll wait and see whether
we need them on rebuttal.

MS. BLOOM: And we looked at your
stipulation. We're okay with everything
except for one thing.

MS. LISS-RIORDAN: What's the one
thing?

MS. BLOOM: I don't think that you
accurately characterized the deposition,
what he said at the deposition, and I have
the pages for you and we can go over it.

MS. CARLIN: Do you have the other
pages as well?

Page 815

1    15 people?
2    A. Yes.
3    Q. Where is your office based?
4    A. Chicago.
5    Q. And is that where it was based when you were
6       vice president of human resources?
7    A. Yes.
8    Q. And now I'm going to be asking you a number
9       of questions related to your
10      responsibilities with respect to Morton's
11      and focusing on the time period in which you
12      were vice president of human resources.
13      Okay?
14   A. Okay.
15   Q. Ms. Hoffmann, is it correct that Morton's
16      has 64 restaurants?
17   A. Today, yes.
18   Q. And would you agree that servers tipping out
19      managers is mandatory at most of those
20      restaurants?
21   A. Yes.
22   Q. Now, I understand that it's a voluntary
23      process in Louisville, Kentucky. Correct?
24   A. Yes.
25   Q. And in the Minneapolis Morton's restaurant

Page 816

1    there's no tipping out at all. Correct?
2    A. That's correct.
3    Q. And, now, putting aside Boston for a moment,
4       in all the other Morton's restaurants
5       waiters are required to tip out managers.
6       Correct?
7    A. There are two other restaurants where it is
8       a little bit different, and that's in our
9       Connecticut Avenue, Washington, DC
10      restaurant and also our Fifth Avenue
11      restaurant in New York.
12   Q. So putting aside these few, Louisville,
13      Minneapolis, DC, and New York and Boston for
14      a moment, at all the other restaurants the
15      percentage of the server's tip-out that goes
16      to managers varies from restaurant to
17      restaurant, but at all of these other
18      restaurants servers are required to share a
19      portion of their tips with managers. Is
20      that correct?
21   A. In all of the restaurants in the United
22      States, yes.
23   Q. So tipping out managers is mandatory in
24      approximately 50 to 60 Morton's restaurants?
25   A. Probably closer to 50.

Page 817

1    Q. And in those restaurants in which servers
2       are required to share their tips with
3       managers, the managers' pay is calculated
4       based upon the understanding that they will
5       be receiving a substantial portion of their
6       income from waiters' tips. Isn't that
7       right?
8    A. I wouldn't say substantial, no.
9    Q. But their salaries are set with an
10      understanding that they will be supplemented
11      by tip-outs from servers. Correct?
12   A. Yes.
13   Q. Now, you would agree, would you not, at
14      least that for some period of time tipping
15      out managers was mandatory in the Boston
16      Morton's as well. Correct?
17   A. I'm sorry. Could you just say that one more
18      time?
19   Q. Sure. At some point in time, would you
20      agree that having servers tip out managers
21      was mandatory in the Boston Morton's?
22   A. Yes, it was.
23   Q. Now, would you say that today servers
24      tipping out managers in the Boston Morton's
25      is mandatory or not mandatory?

Page 818

1    A. It's completely voluntary.
2    Q. And according to your testimony, when would
3       you say that tipping out management became
4       voluntary at Boston?
5    A. In January of 2001.
6    Q. Prior to January 2001 in the Boston
7       Morton's, if a waiter refused to tip out a
8       manager, a waiter could be disciplined for
9       that. Correct?
10   A. Yes.
11   Q. If a waiter refused to tip out a manager in
12      the Boston Morton's, you would agree that
13      prior to January 2001 the waiter could even
14      be terminated for that?
15   A. I don't know of a situation where they would
16      have been terminated for that, no.
17   Q. Were there ever any waiters who were
18      terminated for refusing to tip out
19      management at Morton's in Boston?
20   A. No.
21   Q. Were there ever any waiters who were
22      terminated for opposing the tipping policy
23      at the Morton's in Boston?
24   A. No.
25   Q. Now, you've received a number of claims or

32 (Pages 815 to 818)

## OPT-IN CONSENT FORM
### Mark Johnson, et al., v. Morton's Restaurant Group, Inc.,
Civil Action No. _____

Complete and Mail to:     Shannon Liss-Riordan, Esq.
                              Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C.
                              18 Tremont Street, Suite 500
                              Boston, MA 02108

Name: _____ S.S.# (optional): _____

Address: _____

Telephone: _____ (home)_____ (work)_____ (cell)

E-Mail: _____

### CONSENT TO JOIN COLLECTIVE ACTION
Pursuant to the Fair Labor Standards Act, 29 U.S.C. § 216(b)

1.     I consent and agree to pursue my claims arising out my employment at Morton's in connection with the above-referenced lawsuit.

2.     I work/worked in the position(s) of _____
from on or about _____ (month, year) to on or about _____ (month, year).

3.     During the above time period, I paid a percentage of my tips to Morton's managers or other non-traditionally tipped employees.

4.     I understand that this lawsuit is brought under the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. I hereby consent, agree, and "opt in" to become a plaintiff herein and to be bound by any judgment by the Court or any settlement of this action.

5.     I hereby designate Shannon Liss-Riordan, Esq., of Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C., 18 Tremont Street, Suite 500, Boston, MA 02108, ("Plaintiffs' Counsel"), to represent me for all purposes in this action.

6.     I also designate Mark Johnson, the collective action representative, as my agent to make decisions on my behalf concerning the litigation, including the method and manner of conducting this litigation, entering into settlement agreements, entering into an agreement with Plaintiffs' Counsel concerning attorneys' fees and costs (with the understanding that Plaintiffs' Counsel are being paid on a contingency fee basis, which means that if there is no recovery, there will be no attorneys' fees), and all other matters pertaining to this lawsuit.

Signature: _____ Date Signed: _____

Print Name: _____

### **NOTE**
Statute of limitations concerns mandate that you return this form
as soon as possible in order to preserve your rights.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

Th is is a court-authorized notice and is not a solicitation from a lawyer.
The Court has made no finding as to the merits of the case at this time.

If you are or were employed as a waitstaff employee by a Morton's of Chicago restaurant ("Morton's"), in any state in the U.S., a collective action lawsuit may affect your rights. You have the option to participate in this case, unless you have already participated in a similar case against Morton's that is pending or has been resolved.

A former employee (the "Plaintiff") has sued Morton's in federal court in Massachusetts, alleging that Morton's ur lawfully paid waitstaff less than the minimum wage and deprived them of tip income by requiring them to "tip out" managers or other non-traditionally tipped employees. The case name is Mark Johnson, et al., v. Morton's Restaurant Group, Inc., Civil Action No.
_____.

The Court has permitted the Plaintiff to send Notice to all similarly situated current and former employees so that they may be permitted to "opt in" to, or join, this lawsuit to assert their similar legal rights.

The Court has not yet decided whether Morton's has done anything wrong. There is no money available now, and there are no guarantees that there will be. However, you have the choice to assert your legal rights in this case. If you do, federal law prohibits Morton's from firing or discriminating against you for exercising your rights under the FLSA.

### YOUR LEGAL RIGHTS AND OPTIONS

Do Nothing:  By doing nothing, you retain your legal rights to bring a separate suit against
              Morton's regarding its tip policy. However, if money is later awarded in this case,
              you will not receive a share of the award.

---

Ask to Be Included:  Complete the Opt-In Consent Form.  By "opting in," you gain the possibility
              of getting money that may be awarded from a court order or negotiated in a
              settlement, but you give up the right to sue Morton's separately for the same claims
              brought in this lawsuit.

---

Your options are included in this Notice. To opt-in, you must complete the Opt-In Consent Form and forward it to the attorney designated in the Notice on or before _____.
If you have any questions or concerns, please contact:

Shannon Liss-Riordan, Esq.
Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C.
18 Tremont Street, Suite 500
Boston, MA 02108
(617) 367-7200
sliss@prle.com