**AMERICAN ARBITRATION ASSOCIATION**
**EMPLOYMENT ARBITRATION TRIBUNAL**
**Before Arbitrator Roberta Golick**

| | |
|---|---|
| MARK JOHNSON and KRISTIN AIRES,<br>on behalf of themselves<br>and all others similarly situated,<br><br>Claimants,<br><br>v.<br><br>MORTON'S RESTAURANT GROUP, INC.,<br>And MORTON'S OF CHICAGO, INC.,<br><br>Respondents. | AAA Case No.:<br>11 460 01513 05 |
| KASEY ESPOSITO and SAMANTHA<br>SHEWALTER f/k/a CECCONI,<br>on behalf of themselves<br>and all others similarly situated,<br><br>Claimants,<br><br>v.<br><br>MORTON'S OF CHICAGO/BOSTON, INC.<br><br>Respondent | AAA Case No.:<br>11 160 02864 03 |

## CLAIMANTS' MOTION FOR APPROVAL OF CLASS ACTION SETTLEMENT

Claimants brought this case on behalf of a national class of employees who have

worked at Morton's of Chicago restaurants, challenging the company's tip credit policies

and practices. The Claimants contended that Morton's practice of requiring servers to

pay a portion of their tips to management employees violated the "tip credit" provision of

1

the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. (in particular § 203(m)), and that Morton's was therefore required to pay its employees the full minimum wage.

After four years of litigation (through arbitration), and shortly before the case was set to be tried at an arbitration hearing, the parties reached a proposed settlement of this case. As described below, the settlement amount, $12,000,000, is greater than Claimants' calculation of the total damages at issue.[1] However, because of the company's current financial difficulties, it is not able to pay out the full amount of the settlement at one time or all in cash. Thus the parties have negotiated a payment plan under which half of the settlement will be issued in the form of Preferred Stock and half of the settlement will be paid in cash over a 48 month period.

Given that the settlement will provide compensation in an amount greater than the estimated total damages at issue here on a nationwide scale (though without additional liquidated damages), and given that individual class members who participate in the settlement may receive up to their full individual damages, the Arbitrator should preliminarily approve this settlement as fair, reasonable, and adequate; certify a class for purposes of settlement; and approve notice to be sent to the class

## I.   BACKGROUND OF THE ACTION

On May 20, 2005, former Morton's of Chicago server Mark Johnson (who worked in the Boston restaurant) filed this case against Morton's Restaurant Group, Inc. and Morton's of Chicago, Inc. ("Morton's") in United States District Court for the District of Massachusetts. The case was then referred to arbitration and the parties selected Roberta Golick, Esq. to serve as the Arbitrator. Kristin Aires, another former Morton's

---

1    Claimants' calculation of the estimated damages total approximately $10.4 million.

server (who worked in the Phoenix and Portland restaurants), was later added as an additional lead claimant.  In the arbitration, as in the lawsuit, the claimants contended that Morton's had violated the "tip credit" provision of the FLSA by requiring servers to tip out managers and thus should have paid its employees the full minimum wage.

On June 27, 2007, the Arbitrator granted the Claimants' motion for class certification, and certified a national class of Morton's employees who had been paid less than the federal minimum wage.[2]  The Arbitrator determined that employees who had worked at the Boston restaurant could proceed either as part of this certified class, or continue with a prior case that had been filed earlier on behalf of Boston employees.[3] This settlement includes Boston employees who have not already released their claims against Morton's and includes a longer class period for these employees (based upon the earlier filing date of the Boston case) and an enhanced damages calculation to account for their state law claim for service charges that was included in the Boston complaint.[4]

---

2       Several states were excluded, or provisionally excluded, from this national class, either because prior cases had been filed in those states raising similar claims or because Morton's admissions regarding its national policy had excluded these states.  This settlement covers all states in which Morton's paid its employees less than the federal or state minimum wage and excludes employees whose claims have been released through another case.  Thus, employees in New York whose claims are covered by similar cases filed there (including *Walker et al. v. Morton's Restaurant Group*, AAA No. 13 116 0271302, and *McGraw et al v. Morton's Restaurant Group*, AAA No. 11 160 217106) will not be included in this settlement to the extent all of their claims are barred by release or res judicata  (*.e.g.*, they may participate in this settlement to the extent they worked in Morton's restaurants outside New York).  The parties in this case had an earlier dispute about whether employees who had worked in Florida could be included in this class, because Florida had been excluded from the class certification award based upon prior cases having been filed there.  As part of this settlement, Morton's employees who worked in Florida will be included in this class if they have not already released their claims through a prior settlement.

3       That case, *Kasey Esposito and Samantha Cecconi, et al. v. Morton's of Chicago/Boston, Inc.*, AAA No. 11 160 02864 03, was filed on November 7, 2003, and Lawrence Katz, Esq. was appointed Arbitrator.  That case raised similar claims to this case but also included a claim under the Massachusetts Tips Law, Mass. Gen. L. c. 149 § 152A, challenging Morton's failure to distribute the proceeds of all service charges to non-managerial service employees.  By agreement of the parties, that case was stayed prior to a ruling on class certification, pending the continued litigation of this case.

On November 25, 2008, the federal district court denied Morton's motion to vacate the Arbitrator's class certification award. *Morton's Restaurant Group, Inc. v. Mark Johnson et al*, U.S. Dist. Ct. No. 07-11808 (D. Mass.)  Thereafter the parties began preparing for an arbitration hearing on the merits, which was scheduled for late July 2009.

Following the district court's ruling on the petition to vacate the class certification award, the parties entered intensive settlement discussions, which spanned the course of several months.  The parties had a mediation session with JAMS mediator Michael Loeb, Esq. in March 2009, which did not result in a settlement.  The parties continued settlement discussions directly, and Claimants' counsel engaged a financial expert, Richard Kohn, of UHY Advisors (a firm that provides forensic accounting, investigation, and financial advice in litigation matters) to assist her in analyzing the company's financial position, ability to pay a settlement, and stock-related issues (as the parties discussed Morton's ability to pay a larger settlement if paid part in stock).  The parties reached an agreement in principle in May 2009 and finalized a term sheet on July 7, 2009.  The term sheet is attached here as Exhibit A.  The final settlement agreement, which spells out the terms of the agreement in more detail, is attached as Exhibit B.

As explained further below, the final agreement represents an excellent result for the class, given the company's current financial situation, in that it is for an amount more than the estimated total damages for this case  and allows class members the

---

4       Following the certification of this case, the parties also had a disagreement regarding whether non-server employees who had been paid less than the minimum wage were included in the class.  This issue was briefed and submitted to the Arbitrator.  As part of the settlement, these employees (including bussers and bartenders) will be included as class members, though their distributions will be weighted one-third as heavily as servers' distributions, because, among other things, they were only indirectly affected by Morton's policy of requiring servers to share tips with managers.  This allocation for bussers and bartenders is the same as Claimants' counsel has used in numerous other settlements of tips class action cases that have been approved by the courts (discussed below).

possibility of full recovery for their individual claims.  Although the payment will be made

over time, and half will be in the form of stock rather than cash, this result provides class

members the greatest assurance of receiving any recovery because the alternatives to

settlement would likely have resulted in no recovery for the class.  Had the case not

settled, the parties would have proceeded to an arbitration hearing, which would have

resulted in either a win for the class or a loss.  Had the class lost, obviously the class

would have received no recovery.  Had the class prevailed, it would have been likely to

receive no (or little) recovery; this is because the amount of the anticipated award would

have triggered a default on the company's principal line of credit, which could have had

serious repercussions for the company's continued viability.[5]  Thus, through the

negotiated payment plan contained in this settlement, the class will receive payments

based on the company's anticipated ability to pay, which is preferable to the alternatives

to settlement.

## II.   CERTIFICATION OF SETTLEMENT CLASS

Solely for the purpose of effectuating this Settlement, the Parties have agreed to

consolidate the Esposito Arbitration with the Johnson Arbitration ("Consolidated

---

[5]     Alternatively, the class could have prevailed but been awarded far less in damages than it sought.
This is because Morton's argued strenuously that it was entitled to a "credit" (on a per week basis)
against the minimum wage for service charges paid out to employees for work performed in the
Boardroom. Although Claimants agreed that Boardroom hours for which service charges were paid
would not be included in the damages, Claimants disputed that Morton's should be entitled to a credit for
these service charges against the minimum wage for hours worked in the dining room. Morton's
argument regarding the service charge credit would have reduced the anticipated damages by
approximately 75%. Claimants' $10.4 million calculation of the total damages is based on their view of
the damages they would have been entitled to, without this credit that Morton's had sought for Boardroom
service charges.
     In addition, Morton's argued that it was appropriate for assistant managers to receive a share of
servers' tips under federal law, even if its general managers should not have received a share of the tips.
Because Morton's stopped allowing general managers to share in the tips prior to making this change for
assistant managers, this argument if successful would also have reduced the damages substantially.

Arbitration").  The Parties have also agreed to class certification of a settlement class ("Settlement Class") comprised of all current and former employees of Morton's of Chicago restaurants throughout the United States for whom Morton's has taken a tip credit or who have been paid below the applicable state or federal minimum wage (collectively, the "Covered Employees") at any time during the following time periods (collectively referred to as the "Applicable Recovery Periods"):

(A)    For those Covered Employees in the State of Massachusetts, the Applicable Recovery Period is from November 7, 2000 through the Effective Date of this Agreement.

(B)    For those Covered Employees in any state or territory in the United States (including the District of Columbia), other than the State of Massachusetts, the Applicable Recovery Period is from May 19, 2002 through the Effective Date of this Agreement.

Solely for the purpose of effectuating this Settlement, and subject to Arbitrator and Court approval, Johnson, Aires, and Shewalter shall be appointed as class representatives of the Settlement Class.

## III.    THE PROPOSED PLAN OF DISTRIBUTION OF THE SETTLEMENT FUNDS

As described further in the Term Sheet and Settlement Agreement (Exhibits A and B), the settlement fund in this case will be distributed as follows.  A claims administrator will send notice of the settlement and a claim form to all class members.[6] Morton's will provide the claims administrator with the last known addresses for all class members, and the administrator will perform an address update search before mailing

---

6       There are approximately 7,500 members in the class.

the notice.  Class members will have a 90-day period to respond to the notice, either by submitting a claim form to the claims administrator, opting out of the settlement, or submitting an objection to the settlement.  Notices will be forwarded to any forwarding addresses that are returned by the post office, and the administrator will perform a follow-up address search and mailing for any notices that are returned as undeliverable. A month before the end of the claim period, the administrator will send a reminder postcard to class members who have not yet responded to the notice.

Class members who submit claim forms by the deadline will be participating class members in the settlement.  Through Morton's payroll records, an estimated damages amount will be calculated for each participating class member.  This amount will be calculated as the difference between the base pay received by the employee and the federal minimum wage (or state minimum wage, for states with a higher minimum wage[7]), multiplied by 75% of the number of hours the class member worked during the class period.[8]  As noted earlier, the damages amount will be multiplied by 33% for non-server employees, including bussers and bartenders, to account for the fact that they were indirectly affected by Morton's policy of requiring servers to tip out managers (and Morton's disputed that they should be part of the class).  Boston employees will receive an additional 20% allocation to their damages amount, to account for the additional claim they had under Massachusetts law for Boardroom service charges that were not distributed to non-managerial service employees.  Finally, for servers who also worked

---

[7]     Thus, class members are getting credit for state law minimum wage claims, and the release they will be signing will include claims under state minimum wage laws.

[8]     The 75% reflects an estimate of the overall amount of hours employees have worked in the main dining room, as opposed to the Boardroom, since the hours worked in the Boardroom are not included in the settlement.  Because federal law treats service charges differently from tips (and allows service charges to count toward the minimum wage), Boardroom hours are excluded from the settlement.

as captains, their hours will be multiplied by 80% for any weeks in which they worked as captains, in order to account for the fact that captains received higher hourly base pay than servers.[9]

The net settlement fund (after deduction of claims administrator expenses, attorneys' fees, fees to be paid to an advisor retained to provide advice to class members regarding the stock they receive in connection with the settlement, and incentive payments for the lead claimants) will be distributed to participating class members in proportion to their individual estimated damages amounts, up to the full amount of their estimated damages. In other words, depending on the claim rate for the settlement, participating class members may receive up to their full amount of estimated damages. If the claim rate is high enough so that the estimated damages exceeds the amount available for payment to the class, then the damages per individual will be reduced in pro rata proportion to class members' estimated damages amount.

Based on this formula, it is not expected that there will be unclaimed residual funds from the settlement. However, if there are any residual funds, they will be used for funding a new benefit for current Morton's employees or reinstating a benefit that has been eliminated as part of Morton's recent financial cutbacks (such as 401(k) matching or reinstatement of the company's employee appreciation program).

As noted earlier, the settlement payments will be one-half in cash and one-half in stock. The cash payments will be paid out over a 48 month period, during which Morton's will make quarterly payments into the settlement fund administered by the

---

9    Morton's records do not readily indicate exactly how many hours in a workweek servers worked as captains, and so the parties have agreed on this method for estimating captains' damages.

claims administrator.[10]  The claims administrator will then issue the payments to the class members.[11]  The stock portion of the settlement will be issued all at once, shortly after final approval of the settlement (but no earlier than January 2010).  The stock will be in the form of Preferred Stock and will be immediately tradable.

The Preferred Stock will be convertible to common stock two years after issuance.  The conversion price will be at the greater of $5.00 per share or the average of Morton's common stock price during the preceding 30 days plus a 10% premium.  The "Common Stock Price" shall be computed using the average closing price of the common stock for the thirty (30) day period immediately preceding Court confirmation and approval.  The Preferred Stock will be issued directly to Class Counsel and each class member pursuant to Rule 3(a)(10) of the Securities Act so that it will be freely tradable upon issuance without any requirement to file a registration statement.  The Preferred Stock (and Common Stock issued upon conversion of Preferred Stock) shall be subject to customary market standoff provisions (no more than six months), but shall otherwise be freely tradable.  Morton's will use its best efforts to ensure the Preferred Stock will be listed on an exchange so that there will be a market for trading the Preferred Stock.

No Interest or dividends shall be paid on such Preferred Stock.  Additionally, the Preferred Stock shall have no voting or other rights.  Common Stock issued upon conversion of the Preferred Stock shall have the same voting rights as the existing

---

10    The payment schedule, as noted on the Term Sheet and Settlement Agreement, provides for payments of $250,000 for each of the first three quarters of each year of the cash payout period, and $750,000 for each of the fourth quarters during this period.

11    For class members whose quarterly payments will be less than $100, their payments will be made annually instead of quarterly.

Morton's Common Stock.  The Preferred Stock shall have an aggregate liquidation preference of $6,000,000.  Morton's shall have the right to redeem all or part of the Preferred Stock at its Liquidation Preference at any time prior to conversion.

In addition to these payments to participating class members, the proposed settlement includes incentive payments of $20,000 each for the lead claimants who brought this case forward and assisted counsel with pursuing it on behalf of a class, Mark Johnson, Kristin Aires, and Samantha Shewalter.[12]  Incentive payments have been routinely approved by the courts in class action settlements as a way of compensating class representatives who have lent their names and efforts to the prosecution of litigation on behalf of others.  Courts have also recognized that such payments can serve an important function in promoting class action settlements.  *See Sheppard v. Consolidated Edison Company of New York, Inc.*, 2002 WL 2003206, *5-6 (E.D. N.Y. 2002) (collecting cases approving incentive payments).  Courts have approved incentive payments that are not "greatly disproportionate to the recovery set aside for absent class members" so that they can ensure "that the named plaintiffs, as fiduciaries to the class, have not been tempted to receive high incentive awards in exchange for accepting suboptimal settlements for absent class members."  *Id.*  Here, it is anticipated that class members who worked for substantial lengths of time within the class period will receive damages in higher amounts than these payments, and thus

---

12      These three claimants participated in the case and were important to the prosecution of the claims raised here.  Mark Johnson initiated the case, and Kristin Aires later joined him, providing representation for the class outside of Massachusetts.  Samantha Shewalter (whose previous name was Samantha Cecconi) initiated the Massachusetts case in 2003 together with Kasey Esposito.  However, Kasey Esposito discontinued participation in the Massachusetts case, and Class Counsel has not been able to locate her.  Ms. Shewalter continued as the lead claimant for the Massachusetts case, and was offered as the proposed lead claimant in the motion for class certification filed in that case.  Pursuant to the settlement, if Kasey Esposito is located during the claim period and participates in the settlement and signs a separate full release, she would receive an incentive payment of $5,000.

these incentive payments are reasonable and not disproportionate.[13]

## IV.   THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

It is well-established that settlements of lawsuits are favored over continued

litigation.  *See, e.g., Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910); *Durett v.*

*Housing Auth. of Providence*, 896 F.2d 600, 604 (1st Cir. 1990); *In re Viatron Computer*

*Sys. Corp.*, 614 F.2d 11, 15 (1st Cir. 1980).  Before granting approval of a proposed

class action settlement, the Arbitrator must find that the settlement is fair, reasonable,

and adequate.  See AAA Supplementary Rules for Class Arbitration, Rule 8(a)(3).

A presumption of fairness of a settlement is established where the parties can

show that: (1) the settlement was the product of arms-length bargaining; (2) sufficient

discovery and investigation has been taken to enable counsel and the court to act

intelligently; (3) the proponents of the settlement are counsel experienced in similar

litigation; and (4) the number of objectors or interests they represent is not large when

compared to the class as a whole.  4 Herbert B. Newburg and Alba Conte, *Newburg on*

*Class Actions* § 11:41 (3rd ed. 1992-2002).  In addition, courts consider the amount of

the settlement compared to the amount at issue in the case and the plaintiffs' likelihood

of succeeding on the merits and recovering damages on their claims.  *See, e.g., M.*

*Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 822-23 (D. Mass.

1987).

---

13    *See also Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (awarding $300,000 to each of four representative plaintiffs); *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 373-74 (S.D. Ohio 1990) (citing cases in support of enhancement payments and awarding payments ranging from $35,000 to $50,000 for named plaintiffs); *Yap v. Sumintomo Corp. of Am.*, 1991 WL 29112, *9 (S.D.N.Y. 1991) (awarding $30,000 additional compensation to representative plaintiffs).

In the case at bar, an examination of each of these factors demonstrates that the proposed settlement is fair, reasonable, and adequate to the members of the class, and should be approved by the Arbitrator.

Notably, Claimants' counsel have reached many class action settlements in cases like this one involving waitstaff being required to share tips or gratuities with managerial employees, which settlements have been approved by courts, primarily in Massachusetts.[14] They have also reached national class action settlements in FLSA tip credit cases brought on behalf of skycap employees, which have received preliminary approval from the federal courts in *Barreda et al. v. Prospect Airport Services, Inc.*, C.A. No. 08-3239 (N.D. Ill. July 1, 2009), and *Mitchell et al. v. US Airways, Inc. and PrimeFlight Aviation Services*, Inc., C.A. No. 08-10629 (D. Mass. June 23, 2009).

_____

14       These cases include: *Shea et al. v. Weston Golf Club*, C.A. No. 02-1826 (Middlesex Superior Ct. 2009); *Mouiny v. Commonwealth Flats Dev. Corp. d/b/a Seaport Hotel and World Trade Center*, C.A. No. 06-1115 (Suffolk Superior Ct. 2009); *Verecchia et al. v. DT Management, Inc. d/b/a Hotel @ MIT et al.*, C.A. No. 08-0127 (Middlesex Superior Ct. 2008); *Rose et al. v. Ruth's Chris Steak House Boston, LLC*, C.A. No. 07-5081 (Suffolk Superior Ct. 2008); *Perry et al. v. Woodman's, Inc.*, C.A. No. 08-1218 (Essex Superior Ct. 2008); *Roth v. Vesper Country Club*, C.A. No. 07-1231 (Middlesex Sup. Ct. 2008); *Cooney et al. v. Compass Group Foodservice and Northeastern University*, C.A. No. 02-3159 (Middlesex Superior Ct. 2008); *Paratore et al. v. F-1 Boston Café, LLC*, C.A. No. 02-2162 (Norfolk Superior Ct. 2008); *Byrne et al. v. Elephant and Castle Group, LLC*, C.A. No. 06-4732 (Suffolk Superior Ct. 2008); *Tucker et al. v. Halifax Investments, Inc.*, C.A. No. 07-154 (Plymouth Superior Ct. 2008); *Ng et al. v. Jin Restaurant Group LLC*, C.A. No. 07-333 (Essex Superior Ct. 2008); *Fernandez et al. v. Four Seasons Hotel*, C.A. No. 02-4689 (Suffolk Superior Ct. 2008) (banquets) (Muse, J.); *Banks et al. v. SBH Corp. (Grill 23)*, C.A. No. 04-3515 (Suffolk Superior Ct. 2007) (Connolly, J.); *Frye et al. v. Columbia Sussex Corp.*, C.A. No. 06-4622 (Middlesex Superior Ct. 2007) (Billings, J.); *Calcagno et al. v. High Country Investor, Inc. (Hilltop)*, C.A. No. 03-0707 (Essex Superior Ct. 2006) (Murtagh, J.); *Ellison, et al. v. NPS, LLC*, C.A. No. 05-01105 (Middlesex Sup. Ct. 2006) (Hamlin, J.); *Meimaridis, et al. v. Brae Burn Country Club*, C.A. No. 04-3769 (Middlesex Superior Ct. 2006) (Fremont-Smith, J.); *Hough et al. v. Select Restaurants, Inc. d/b/a Top of the Hub*, C.A. No. 05-1258 (Suffolk Sup. Ct. 2006) (Brassard, J.); *Bullock et al. v. Ritz-Carlton Hotel Co.*, C.A. No. 04-04379 (Suffolk Sup. Ct. 2005); *Michalak et al. v. Boston Palm Corporation*, C.A. No. 03-1334 (Suffolk Sup. Ct. 2004) (White, J.); *Williamson et al. v. DT Management Co. d/b/a Boston Harbor Hotel, Inc.*, C.A. No. 02-01827 (Middlesex Sup. Ct. 2004) (Neel, J.); *Fernandez et al. v. Four Seasons Hotel, LTD*, C.A. No. 02-4689 (Suffolk Sup. Ct. 2004) (room service) (Walker, J.); *Keyo et al. v. Seaport Hotel and World Trade Center Boston, et al.*, C.A. No. 02-3339 (Suffolk Sup. Ct. 2004) (Murphy, J.); *Licari et al. v. Meridien Hotels, Inc.*, C.A. No. 02-3340 (Suffolk Sup. Ct. 2003) (McEvoy, J.); and *Latta et al. v. The Nashawtuc Country Club, Inc.*, C.A. No. 01-4185 (Middlesex Sup. Ct. 2003) (Giles, J.).

In addition, Claimants' counsel has settled another AAA class arbitration raising a tip credit claim under the FLSA, which also used notice and distribution terms similar to this settlement, *Robert Bryant et al. v. Joel Antunes, LLC*, AAA No. 11 160 01783 05.  That settlement has been approved by the Hon. George C. Pratt, Arbitrator.

Although the terms of this settlement are somewhat more detailed and involved than many of these other settlements (given the larger scale of this case and the detailed payment plan that has been negotiated here), the basic principles behind the notice and distribution method in this case are similar to those successfully utilized in these other cases that Claimants' counsel has settled.

**A.      The Parties Entered into the Settlement, after More Than Four Hard-Fought Years of Litigation, as a Result of Arm's-Length Negotiations**

After more than four years of litigation, including discovery, extensive briefing on numerous issues, including clause construction, class certification, and other issues, the parties ultimately engaged in negotiations over a period of months just prior to a final hearing in this case.  The negotiated settlement amount exceeds the total amount of estimated damages for the class, and the terms of the settlement payout were vigorously negotiated (with assistance for Claimants' counsel from a professional forensic financial advisor).  This case was rigorously defended by Morton's and zealously pursued by Claimants' counsel.  The settlement was clearly reached as a result of arm's-length negotiations.

When sufficient discovery has been provided and the parties have bargained at arm's-length, there is a presumption in favor of the settlement.  *See City Partnership Co. v. Atlantic Acquisition*, 100 F.3d 1041, 1043 (1st Cir. 1996); *United States v. Cannons Engineering Corp.*, 720 F. Supp. 1027, 1036 (D. Mass. 1989); *Berenson*, 671 F. Supp. at 822 (where a proposed class settlement has been reached after meaningful discovery, after arm's length negotiation, conducted by capable counsel, it is presumptively fair).

13

**B.**     <u>Claimants' Counsel is Highly Experienced in Similar Litigation</u>

Over the last eight years, Claimants' lead counsel, Attorney Shannon Liss-

Riordan, has represented waitstaff in more than fifty cases very similar to this one,

brought under state and federal tips laws, in which the waitstaff claim they have not

been permitted to retain their full gratuities or have been required to share their tips with

management employees.   Many of these cases have settled, and others remain in

various stages of litigation.   Along with her co-counsel Attorney Schwab, she has taken

three tips cases to trial and has won all three before juries:  *Calcagno et al. v. High*

*Country Investor, Inc., d/b/a Hilltop Steak House*, C.A. No. 03-0707, Mass. Sup. Ct.

(Essex 2006) (banquet coordinators not entitled to share in gratuities); *Benoit et al. v.*

*The Federalist, Inc.*, C.A. No. 04-3516, Mass. Sup. Ct. (Suffolk 2007) (same); and

*DiFiore et al. v. American Airlines, Inc.*, C.A. No. 07-10070, U.S. Dist. Ct. (D. Mass.

2008) (airline's policy of collecting $2 per bag charge for curbside check-in that was not

distributed to skycaps violated Mass. Tips Law and rendered airline liable for tortious

interference with advantageous relations).   She has taken one tips case to the

Massachusetts Appeals Court, which she also won: *Cooney et al. v. Compass Group*

*Foodservice,* 69 Mass. App. Ct. 632 (2007) (reversing trial court's denial of summary

judgment for plaintiff servers, holding that Massachusetts Tips Law should be strictly

construed against establishment that did not distribute proceeds of "service charges" to

waitstaff employees).   She has prevailed on summary judgment on behalf of plaintiff

waitstaff in at least seven tips cases.  Along with her New York co-counsel, Attorney

Liss-Riordan has been appointed lead interim class counsel (in a contested motion) on

behalf of Starbucks baristas across New York State by the federal district court in the

case of *In re Starbucks Employee Gratuities Litigation*, C.A. No. 08-3318-LTS (S.D.N.Y. 2008).[15]

Claimants' counsel is thus well aware of the law in this area.  Her experience in this area provided the class with a high degree of expertise, which clearly contributed to a favorable resolution of this case on the eve of a final hearing.  Claimants' counsel used the knowledge derived from these other cases in assessing what would be a fair settlement for Claimants in this case.

### C.      Following the Notice Period, the Arbitrator Will Be Able to Assess the Reaction of the Class to the Settlement

As noted above, another factor courts look to in determining the fairness of the settlement is whether there are any objectors to a settlement, and if so whether the number of objectors or interests they represent is not large when compared to the class as a whole.  This factor can be assessed by the Arbitrator after the notice and objection period.

## V.     THE REQUESTED ATTORNEYS' FEE IS FAIR AND REASONABLE AND SUPPORTED BY THE APPLICABLE PRECEDENT

The proposed distribution of the settlement proceeds provides for one-third of the settlement to pay for attorneys' fees and expenses.  The named claimants support this payment, and the proposed notice of settlement will inform class members that one-third of the settlement proceeds would be used to pay for attorneys' fees.[16]  Claimants' counsel accepted this case on a contingent arrangement, and the proposed fee is the

---

[15]     For profiles of Attorney Liss-Riordan's work on behalf of tipped employees, *see* Exhibit C (*Boston Globe*, front page, Apr. 29, 2008, "Skycaps and waiters find a legal champion"), and Exhibit D (*Lawyers and Settlements*, Apr. 9, 2008, "Attorney Shannon Liss-Riordan: Challenging Corporate Power and Tips Abuse").

[16]     The class representatives signed a retainer agreement providing that counsel would receive one-third of the proceeds of any judgment or settlement.

same standard one-third share that has been approved by all the judges who have ruled

on the fairness of the other settlements achieved by Claimants' counsel in tips law

cases listed above.  The Arbitrator should also preliminarily approve this fee as fair and

reasonable.

As noted above, Claimants' counsel has been a pioneer in the development of

the law protecting tipped employees.  She has received national news coverage for her

work in this area, which has enhanced wage protections for tipped employees across

the country, as her work has been noted and replicated.  Having handled more than fifty

cases herself on behalf of tipped employees, including three that resulted in successful

jury verdicts, one that resulted in a favorable state Appeals Court ruling, more than a

dozen that have been heard on summary judgment, and more than two dozen that have

settled, counsel was able in this case to draw from the benefit of this experience.  This

experience provided the class a high degree of expertise in this area.

Courts generally favor awarding fees from a common fund based upon the

percentage of the fund method.  As the Supreme Court has explained:

> [T]his Court has recognized consistently that a litigant or a lawyer
> who recovers a common fund for the benefit of persons other than
> himself or his client is entitled to a reasonable attorneys' fee from
> the fund as a whole. . . .  Jurisdiction over the fund involved in the
> litigation allows a Court to prevent . . . inequity by assessing
> attorney's fees against the entire fund, thus spreading fees
> proportionately among those benefited by the suit.

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980 (Citations omitted.)  *See also Blum*

*v. Stenson*, 465 U.S 886, 900 n.16 (1984); *In re Thirteen Appeals Arising Out of the San*

*Juan Dupont Plaza Hotel Fire Lit.*, 56 F.3d 295 (1st Cir. 1995) (awarding attorneys' fees of $68 million out of a $220 million settlement fund).[17]

A one-third attorney's fee in a common fund case has been consistently approved as reasonable.  Examples of cases in which a one-third fee was approved include *Chalverus v. Pegasystems, Inc.*, C.A. No. 97-12570-WGY (December 19, 2000) (awarding as an attorneys' fee one-third of a more than $5 million recovery); *In re: Peritus Software Services, Inc. Sec. Litig.*, C.A. No. 98-10578-WGY (February 28, 2000); *In re: Copley Pharmaceutical, Inc. Sec. Litig.*, C.A. No. 94-11897-WGY (D. Mass. Feb. 8, 1996) (awarding one-third of a $6.3 million settlement fund); *Morton v. Kurzweil Applied Intelligence, Inc.*, C.A. No. 10829-REK (D. Mass. Feb. 4, 1998); *In re Gillette Securities Litigation*,  C. A. No. 88-1858-REK (D. Mass. Mar. 30, 1994); *Wilensky v. Digital Equipment Corporation*, C.A. No. 94-10752-JLT (July 11, 2001); *In re Picturetel Corporation Sec. Litig.*, C.A. No. 97-12135-DPW (D. Mass. Nov. 4, 1999) (approving award of one-third of a $12 million settlement fund); *Zeid v. Open Environment Corp.*, C.A. No. 96-12466-EFH (D. Mass. June 24, 1999) (awarding a fee of one-third of a $6 million settlement).[18]  Given this precedent approving one-third recovery for attorneys'

---

[17]      Among the advantages recognized by the First Circuit in *Thirteen Appeals*, was the fact that the percentage method is less burdensome to administer than the lodestar method.  *See id.* at 307.  The court also endorsed the percentage of recovery approach because it is result-oriented, and hence it promotes the more efficient use of attorney time, and because the percentage method also better reflects the market value of counsel's services.  In *Thirteen Appeals*, the First Circuit noted that other Courts of Appeals have *required* the use of percentage awards in common fund cases.  *See, e.g., Camden Condominium Ass'n v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991); *Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1271-72 (D.C. Cir. 1993).  *See also* Report of Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 255 (1985) and Federal Judicial Center, *Awarding Attorneys' Fees and Managing Fee Litigation*, 63-64 (1994).

[18]      Examples of such awards from other states include *In Re: Lithotripsy Antitrust Litigation*, No. 98 C 8394, 2000 U.S. Dist. LEXIS 8143 at *6-7 (N.D.Ill. June 12, 2000) (noting that 33.3% of the fund plus expenses is well within the generally accepted range of the attorneys fee awards in class-action lawsuits.); *In re: Medical X-Ray Film Antitrust Litigation*, CV-93-5904, 1998 U.S. Dist. LEXIS 14888 at *21 (E.D.N.Y. Aug. 7, 1998) (awarding a fee of $13 million, which represented one-third of the settlement); *In*

fees in class action cases, the Arbitrator should likewise recognize that a one-third recovery in this case is reasonable.

## VI.    CONCLUSION

For the reasons set forth above, Claimants respectfully request that the Arbitrator grant preliminary approval of the Settlement Agreement as fair, reasonable, and adequate, preliminarily certify the class described above for settlement purposes, preliminarily appoint Claimants Johnson, Aires, and Shewalter as class representatives for the settlement class, and approve the notice to be sent to the class.  At the final fairness hearing, scheduled for November 11, 2009, Claimants will report on the results of the notice process and request that the Arbitrator give her final approval of the settlement.

Respectfully submitted,

Mark Johnson, et al,
By their attorneys,


   /s/  Shannon Liss-Riordan
Shannon Liss-Riordan, BBO #640716
Hillary Schwab, BBO #666029
LICHTEN & LISS-RIORDAN, P.C.
100 Cambridge Street, 20th Floor
Boston, MA 02114
(617) 994-580

July 27, 2009

---

re Crazy Eddie Securities Litig., 824 F. Supp. 320, 325-26 (E.D.N.Y. 1993) (awarding 34% of a $42 million fund); City National Bank v. American Com. Financial Corp., 657 F. Supp. 817 (W.D.N.C. 1987); In re Franklin Nat'l Bank, [1980 Transfer Binder] Fed. Sec. L. Rep. (CCH) &97,571 (E.D.N.Y. 1980) (34% of settlement fund); Hwang v. Smith Corona Corp., B.89-450 (D. Conn. Mar. 12, 1992) (awarding one-third of $24 million fund).

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2009, I caused a copy of this document to be served by electronic mail on Michael J. Gray, Esq., Jones Day, 77 West Wacker, Suite 3500, Chicago, IL 60601, counsel for the respondents.

    /s/  Shannon Liss-Riordan
Shannon Liss-Riordan, Esq.

> **THIS TERM SHEET HAS BEEN PREPARED FOR USE IN SETTLEMENT DISCUSSIONS BETWEEN MORTON'S AND COUNSEL FOR JOHNSON AND MAY NOT BE USED FOR ANY OTHER PURPOSE**

## FINAL TERM SHEET
### July 7, 2009

<u>Settlement Amount</u>:  $12M

<u>Class Covered</u>:  All employees at Morton's of Chicago restaurants in the United States for whom Morton's has taken a tip credit or been paid below the applicable state or federal minimum wage since May 19, 2002.  For Massachusetts employees, since November 7, 2000.

<u>Claims Covered</u>:  FLSA (Johnson), MA State (Esposito) and all other federal and state claims related to minimum wage violations and unlawful tip credits.  Full and binding release to cover all such claims against Morton's and all of its past and present companies, parents, subsidiaries, related entities, employees, executives, agents, etc. for period up to and including the date the settlement agreement is executed.

<u>Cash/Equity Split</u>:  50/50

<u>Settlement Fund/Cash Payment Terms</u>:  $6M paid over 48 months following Court confirmation.

- First 12 months:
  - $1.5M to be paid in the following quarterly installments (at the end of each quarter), provided that in no event will the first payment be due before March 31, 2010:
    - Q1: $250K
    - Q2: $250K
    - Q3: $250K
    - Q4: $750K (to be paid by December 15, 2010)

  - Morton's may defer any quarterly payment in the first year for a period of time not to exceed the Final Payment Date (<u>i.e.</u>, the 48th month).

  - Deferred payments shall accrue simple interest at the per annum rate of 14%.  Accrued interest shall be payable when the quarterly payment is actually paid by Morton's.

- Each Successive 12 month period (<u>i.e.</u>, months 13-24, 25-36 and 37-48):
  - $1.5M to be paid in the following quarterly installments (at the end of each quarter):
    - Q1: $250K

- Q2: $250K
- Q3: $250K
- Q4: $750K (to be paid by December 15 of each year)
  - o Payments not made when due shall accrue simple interest at the per annum rate of 14%.

- With the exception of the portion of the payments designated for attorneys fees, incentive payments and settlement administration, these payments shall be payable by Morton's directly to class members and allocated as 50% wages (with appropriate employee tax withholdings) and 50% non-wage-related income (subject to changing tax treatment of the equity portion of the settlement). The portion of the settlement amount designated as attorneys fees will be taxable to Plaintiffs' counsel. If appropriate from applicable taxing authorities, the taxes and withholdings from the settlement payments will be taken from the cash rather than the equity portions of the settlement.

Settlement Fund/Equity Issuance:

- $6M of Preferred Stock to be issued by Morton's within 30 days following Court Confirmation or longer as regulatory measures demand. (Depending on tax treatment of the preferred stock, which Morton's counsel is investigating, the parties may jointly determine to reconfigure the terms and manner of the equity issuance to reduce the tax liability on the class.)

- Exemption from Registration/Listing: Preferred Stock to be issued pursuant to Rule 3(a)(10) of the Securities Act so that it will be freely tradable upon issuance (subject to customary market standoff, no more than six months) without any requirement to file a registration statement.

- The Preferred Stock will be listed on an exchange so that there will be a market for trading the Preferred Stock.

- Shares to be issued directly to each individual claimant who participates in the settlement.

- Preferred Stock (and Common Stock issued upon conversion of Preferred Stock) shall be subject to customary market standoff provisions (no more than six months), but shall otherwise be freely tradable.

- Aggregate Liquidation Preference: $6M.

- Redemption: Morton's shall have the right to redeem all or part of the Preferred Stock at its Liquidation Preference at any time prior to conversion.

- Preferred Stock shall be convertible to Morton's Common Stock at any time after the two year anniversary of the issuance of the Preferred Stock.

- o   Conversion Price shall be the greater of (i) $5.00 per share and (ii) the Common Stock Price (as defined below) plus a 10% premium.
- o   Common Stock Price shall be computed using the average closing price of the Common Stock for the thirty day period immediately preceding Court Confirmation.

- No interest or dividends.

- Voting/Other Rights:

   - o   Preferred Stock shall have no voting or other rights.

   - o   Common Stock issued upon conversion of the Preferred Stock shall have the same voting rights as the existing Morton's common stock.

Distribution Formula:

- Payments to be computed on an individual basis for each class member amounting to the difference between the class member's base hourly tip credit wage rate and the federal or applicable state minimum wage (whichever is higher), multiplied by an agreed upon percentage of the hours the class member worked, and subject to pro rata deductions depending on class participation. The Parties will agree on a reasonable formula to estimate the number of hours each class member worked in each position covered by the settlement. Proceeds from service charges received for work performed in the Boardroom will not be included in the base hourly tip credit wage rate, and time worked in the Boardroom will not be included in the calculations. The Parties will agree on a reasonable formula for estimating time spent on work performed in the Boardroom.

- A reasonable, agreed-upon allocation shall be made for Massachusetts claimants to account for service charge claim.

- Morton's will not pay any monies in excess of cash and equity provided in aforementioned $6M amounts.

- Any class members who signed a release for the claims alleged (or is bound by another settlement of the claims alleged) shall not participate in the settlement fund.

- The parties will agree on calculating the particular formula for payments. Class members for whom Morton's took any type of tip credit for hours worked in a non-server position may recover for only up to one-third of the hours spent, or reasonably estimated to be spent, in such a non-server position based on the

formula set forth above.

- The parties shall allow for an ample time period for all claimants to make claims and will provide an agreed-upon sum of the existing monetary portion of the settlement fund, of no more than $20K, to be held for late claims received after the bar date, but before the final approval.

- Depending on the participation in the settlement, payments to class members shall be reduced pro rata so as not to exceed the settlement fund (less attorneys fees, costs of settlement administration, and incentive payments)

- Payment calculation not to include doubling, tripling or interest.

- Distributions to be made using 50% cash and 50% equity.

Settlement Payments and Administration:

- Morton's will not oppose service payments for 3 lead plaintiffs in amount of $20,000 each or request for attorneys fees of 1/3 of cash and equity fund (to be paid directly to counsel) by Plaintiffs counsel, both of which shall be disbursed from the settlement fund.

- Parties will work cooperatively to ensure class members receive effective notice, including an address change tracking and follow-up mailing, if a notice is returned as undeliverable, and one reasonably-priced follow-up postcard near the end of the notice period to non-responding class members. All to be paid by the settlement fund.

- A class administrator will be agreed upon by the parties and costs of the administration will be paid from the settlement fund.

- Plaintiffs may also hire an adviser for class members related to equity issues, with fees not to exceed $25,000, to be paid from the settlement fund. All such fees must be incurred on or before the distribution of the last issuance of cash under this Agreement.

- The parties will allot for a 90-day claims period so as to permit ample time for class members to make claims. Class members will have this same 90-day period to opt-out or object to the settlement. No late claims will be permitted after Arbitrator approval of settlement, unless late-claiming class members can demonstrate that they did not receive notice within the period, in which case their claims will be accepted up to the time of Court approval. Prior to Court Confirmation, any disputes regarding distribution issues that cannot be first amicably resolved shall be brought to Arbitrator Roberta Golick for final and binding resolution.

- Following Court Confirmation, if a dispute regarding distribution or equity arises, any such disputes will be resolved between counsel for the class and counsel for Morton's. If the dispute cannot be resolved between counsel, the parties agree to submit the dispute to Roberta Golick for decision (provided that no new arbitration need be opened; rather, the dispute shall be submitted to Golick directly).

Unclaimed funds: Any unclaimed cash/equity from the settlement amount shall be treated as follows:

- Unclaimed cash will be retained by Morton's and solely used by it to fund a new benefit for Morton's employees or reinstate a pre-existing benefit for Morton's employees (such as 401(k) matching or employee appreciation program) as determined by Morton's management with notice to class counsel.

- Unclaimed equity will not be issued by Morton's. To the extent any such equity is not issued, and the value of such equity (as determined at the time of issuance) has not been used already by Morton's to fund a new benefit for Morton's employees or reinstate a pre-existing benefit for Morton's employees (as described in the previous paragraph), at the end of the 48-month payment period, Morton's shall use such funds to fund a new benefit for Morton's employees or reinstate a pre-existing benefit for Morton's employees (as described in the previous paragraph).

Confidentiality: Counsel will mutually agree upon any communications of the settlement terms to anyone other than the parties, Arbitrator, Court and class members.

Cooperation: Parties will cooperate to obtain prompt approval of settlement by Arbitrator Golick and Judge Wolf.

AS TO THE TERMS:


Counsel for Plaintiffs                          Counsel for Morton's
Shannon Liss-Riordan                            Michael J. Gray

AMERICAN ARBITRATION ASSOCIATION
EMPLOYMENT ARBITRATION TRIBUNAL

MARK JOHNSON, and KRISTIN AIRES, on
behalf of themselves and all others similarly
situated,

      Claimants,

    v.

MORTON'S RESTAURANT GROUP, INC.,
and MORTON'S OF CHICAGO, INC.,

      Respondents.

AAA Case No.: 11 460 01513 05

KASEY ESPOSITO, and SAMANTHA
SHEWALTER f/k/a CECCONI, on behalf of
themselves and all others similarly situated,

Claimants,

v.

MORTON'S OF CHICAGO/BOSTON, INC.,

Respondent.

AAA Case No.: 11 160 02864 03

## SETTLEMENT AGREEMENT

    This Settlement Agreement (collectively, the "Agreement" or "Settlement"), is entered into by and between Mark Johnson, Kristin Aires, and Samantha Shewalter ("Settlement Claimants"), individually and as class representatives on behalf of the Settlement Class as defined in Section 3.1, on the one hand, and collectively Morton's Restaurant Group, Inc., Morton's of Chicago, Inc., and Morton's of Chicago/Boston, Inc. ("Morton's"), on the other. The Settlement Class (as defined in Section 3.1) and Morton's will be referred to collectively herein as the "Parties" or "Settling Parties."

## 1.RECITALS

    1.1    On November 7, 2003, Kasey Esposito and Samantha Cecconi – former Servers at Morton's in Massachusetts – filed an arbitration before the American Arbitration Association

- 1 -

entitled Esposito et al. v. Morton's of Chicago/Boston, Inc., AAA Case No. 11 160 02864 03 ("Esposito Arbitration").

    1.2    On May 20, 2005, Mark Johnson – a former Server at Morton's in Massachusetts – individually and on behalf of a class of persons similarly situated, brought suit against Morton's Restaurant Group, Inc. in the United States District Court, District of Massachusetts before Judge Mark L. Wolf ("Johnson Lawsuit").

    1.3    The Johnson Lawsuit was dismissed, and on July 5, 2005, Johnson filed an arbitration before the American Arbitration Association entitled Johnson et al. v. Morton's Restaurant Group, Inc., and Morton's of Chicago, Inc., AAA Case No. 11 160 01513 05 ("Johnson Arbitration").

    1.4    On January 13, 2006, the demand in the Johnson Arbitration was amended to add Kristin Aires – a former Server at Morton's in Oregon and Arizona – as a named claimant.

    1.5    Solely for the purpose of effectuating this Settlement, the Parties have agreed to consolidate the Esposito Arbitration with the Johnson Arbitration ("Consolidated Arbitration") before Arbitrator Roberta Golick ("the Arbitrator").

    1.6    In the Johnson Lawsuit, the Johnson Arbitration, the Esposito Arbitration, and the Consolidated Arbitration ("the Litigation"), the Settling Claimants have alleged claims, on behalf of themselves and on behalf of a class of similarly situated current and former employees across the United States, that Morton's violated federal and state laws regarding the payment of minimum wages, including claims that all employees in the United States for whom Morton's claimed a tip credit are owed restitution for tips and service charges that they were not permitted to retain, the portion of the minimum wage that they did not receive, liquidated damages, penalties, interest, attorneys' fees and costs, and any other relief to which they may be entitled.

    1.7    Morton's asserts that all of its employees are and always have been properly paid, that Morton's has not unlawfully prohibited any of its employees from retaining its tips and service charges and that Morton's has properly paid its employees the minimum wage and overtime in compliance with both the Fair Labor Standards Act ("FLSA") and state laws.

    1.8    The Settlement Claimants and Morton's do not abandon their respective positions on the merits of their claims and defenses in the Litigation. Nonetheless, the Parties recognize that continued litigation would be protracted, expensive, uncertain, and contrary to their best interests. Accordingly, the Parties believe this Settlement is the most efficient and beneficial method to resolve the claims actually asserted and those that could have been asserted therein.

## 2. CONDITIONS PRECEDENT TO EFFECTIVENESS OF AGREEMENT

    2.1    This Agreement will become final and effective only upon the occurrence of all of the following events:

    (A)    The Arbitrator enters an order consistent with and approving the terms contained in this Agreement;

- 2 -

(B)    The Arbitrator enters an order granting final approval of the Settlement;

(C)    Judge Wolf of the United States District Court for the District of Massachusetts (or, if he is not available, another judge from the United States District Court for the District of Massachusetts) enters an order granting Court Confirmation of the Arbitrator's Order and approving the terms of the Settlement.

(D)    The Effective Date occurs. The "Effective Date" shall be the later of: (i) the day the time to appeal or seek permission to appeal or seek other judicial review of the entry of the final order approving the Settlement has expired, with no appeal or other judicial review having been taken or sought; or (ii) if an appeal or other judicial review has been taken or sought, the date the final order is finally affirmed or the appeal or request for judicial review has been dismissed, with no possibility of subsequent appeal or other judicial review therefrom.

## 3. CLASS CERTIFICATION

3.1    Solely for the purpose of effectuating this Settlement, and subject to Arbitrator and Court approval, the Settling Parties hereby stipulate to class certification of a settlement class ("Settlement Class") comprised of all current and former employees of Morton's of Chicago restaurants throughout the United States for whom Morton's has taken a tip credit or who have been paid below the applicable state or federal minimum wage (collectively, the "Covered Employees") at any time during the following time periods (collectively referred to as the "Applicable Recovery Periods"):

(A)    For those Covered Employees in the State of Massachusetts, the Applicable Recovery Period is from November 7, 2000 through the Effective Date of this Agreement.

(B)    For those Covered Employees in any state or territory in the United States (including the District of Columbia), other than the State of Massachusetts, the Applicable Recovery Period is from May 19, 2002 through the Effective Date of this Agreement.

3.2    Each Covered Employee who worked during the Applicable Recovery Period shall be referred to herein as a "Settlement Class Member."

3.3    Solely for the purpose of effectuating this Settlement, and subject to Arbitrator approval and Court confirmation and approval, the Settling Parties stipulate that the law firm of Lichten & Liss-Riordan, P.C. shall be appointed as Class Counsel for the Consolidated Arbitration and the Settlement Class.

3.4    Solely for the purpose of effectuating this Settlement, and subject to Arbitrator and Court approval, Johnson, Aires, and Shewalter shall be appointed as class representatives of the Settlement Class.

## 4. SETTLEMENT PROCESS

4.1    **Settlement Administrator**

(A)    The Parties will select a third-party to administer this settlement to act as the claims administrator, and to carry out the functions specified in this Agreement ("Settlement Administrator"). The Settlement Administrator will distribute the Settlement Class Member Documents (defined in Section 4.3(B) below), and handle inquiries about such documents, but does not have discretion to amend or interpret this Agreement.

(B)    The Settlement Administrator shall establish, maintain, and administer a Settlement Fund before any distribution of any payments under this Agreement and shall carry out all duties required of such Fund by this Agreement, which shall include making appropriate tax withholdings on cash payments to Qualified Settlement Class Members.

(C)    The Settlement Administrator shall not have any authority or discretion to make substantive decisions concerning the Settlement Amount, Qualified Settlement Class Members, or the notice or claims process; nor shall it have discretion to alter this Agreement or Settlement in any way.

(D)    Under no circumstances shall the Settlement Administrator make any disbursement to Qualified Settlement Class Members or Class Counsel until (1) all timely claims have been calculated and accounted for; (2) this Agreement receives final approval by the Arbitrator and confirmation and approval by the Court; and (3) the Effective Date of Settlement.

4.2    **Preliminary Approval of Settlement**

As soon as practicable, the Settlement Claimants will file a motion with the Arbitrator seeking preliminary approval of this Agreement, embodied as a Motion for an Order Preliminarily Approving of Class Settlement, Certification of a Settlement Class, Approval of Class Notice, and Setting Final Fairness and Approval Hearing ("Preliminary Approval Order").

4.3    **Notice to Settlement Class Members**

(A)    As soon as practicable following the Arbitrator's entry of the Preliminary Approval Order, Morton's will provide the Settlement Administrator with a list, in electronic form, of the names, last known addresses, Social Security numbers, payroll data, and other information necessary to calculate the estimated amount that each Settlement Class Member is eligible to receive pursuant to this Settlement from the beginning of the Applicable Recovery Period through June 30, 2009 ("Estimated Settlement Payment").

(B)    Promptly following the Arbitrator's entry of the Preliminary Approval Order, the Settlement Administrator shall prepare final versions of the following documents, incorporating into the documents relevant dates and deadlines: Notice of Class Action Settlement and Opportunity to Opt-Out or Object to Settlement to be provided to Settlement Class Members (which will include an estimate of the number of hours in each position for which each Settlement Class Member is eligible to recover during the Applicable Recovery Period and a description of the manner in which settlement payments will be calculated), Opt-Out Statement, Claim Form, and Individual Release (collectively, the "Settlement Class Member Documents"). The Settlement Administrator shall mail, via First Class United States mail, postage prepaid, the final versions of the Settlement Class Member Documents to each individual Settlement Class Member. Before mailing the Settlement Class Member Documents,

- 4 -

the Settlement Administrator shall update the information provided by Morton's pursuant to Section 4.3(A) through a commercial National Change of Address Database along with any updated information provided by Class Counsel concerning Settlement Class Members' addresses. The Settlement Administrator shall conduct one follow-up mailing, if a notice is returned as undeliverable, and one follow-up postcard one month prior to the end of the notice period to non-responding Settlement Class Members.

(C)     Class Counsel shall be permitted to communicate with Settlement Class Members throughout the disbursement period, including sending letters to provide updates on the status of payments and equity issues.

### 4.4    Settlement Class Member Eligibility for Payment Under this Agreement

(A)     Settlement Class Members shall be eligible for payment under this Agreement if they (i) do not Opt-Out pursuant to Section 4.5 below and (ii) timely and fully execute and return to the Settlement Administrator the Claim Form and Individual Release (in accordance with the instructions thereon) ("Qualified Settlement Class Members"). Such Claim Forms and Individual Releases shall be included in the Settlement Class Member Documents, as described in Section 4.3.

(B)     The Claim Form and Individual Release must be signed by the Settlement Class Members or their legally authorized representatives, without deletion or amendment of the release language, and returned to the Settlement Administrator postmarked no later than ninety (90) days after the date the Settlement Class Member documents are mailed (the "Initial Claim Deadline"). Such deadline shall be communicated to the Settlement Class Members in the Class Notice of Settlement.

(C)     Any Settlement Class Member's Claim Form and/or Individual Release that is not properly executed or that is postmarked after the Initial Claim Deadline shall be conclusively deemed untimely and invalid; provided, however, Settlement Class Members may be eligible to participate in a "Reserve Fund" created for untimely or invalid forms. The Parties have agreed to a Reserve Fund of no more than $20,000 of the Cash Portion of the Settlement Amount (defined in Section 5.1 below). In order to receive funds from the Reserve Fund, Qualified Settlement Class Members must have properly and completely executed and returned the Claim Form and Individual Release after the Initial Claim Deadline but before the date of Final Arbitrator Approval ("Reserve Fund Claimants"). Reserve Fund Claimants are eligible to receive payments from the Reserve Fund on a first come, first serve basis based on the date on which the Settlement Administrator received their Settlement Class Member Documents.

(D)     A Settlement Class Member who fails to submit a timely and valid Claim Form and/or Individual Release, as required by Paragraph 4.4(B), or fails to comply with the procedures of Paragraph 4.4(C), shall receive no monetary or other benefit from this Settlement.

(E)     The Settlement Administrator and/or Class Counsel may respond to requests from Settlement Class Members for assistance in completing the Claim Form. In the event of a question regarding the validity of any Claim Form and/or Individual Release, the

- 5 -

Settlement Administrator shall notify the Parties of such question. After receiving such notice, the Parties shall attempt to reach an agreement on whether the questionable claim is valid.

### 4.5    Settlement Class Member Opt-Out

(A)    Any Settlement Class Member may request exclusion from the Settlement Class by submitting a written and signed request for exclusion to the Settlement Administrator, in the form of the Opt-Out Statement. Such Opt-Out Statement shall be included in the Settlement Class Member Documents, as described in Section 4.3; any Settlement Class Member requesting an Opt-Out Statement shall promptly be furnished one by the Settlement Administrator or Class Counsel. The Opt-Out Statement must include the person's name, address, signature, the date, and a statement clearly indicating that the person has elected to opt-out of the settlement.

(B)    To be effective, a Settlement Class Member's Opt-Out Statement must be sent to the Settlement Administrator and post-marked no later than ninety (90) days after the Settlement Class Member Documents are mailed (the "Opt-Out Period"). This deadline applies notwithstanding any assertion of non-receipt of the Settlement Class Member Documents by any Settlement Class Member. Any Settlement Class Member who submits a valid and timely Opt-Out Statement shall not be a member of the Settlement Class, shall be barred from participating in this Settlement, shall receive no monetary benefit from this settlement, and shall not be subject to the Release of Claims provided for in Section 6 below.

(C)    If a Settlement Class Member submits a Claim Form, Individual Release, and an Opt-Out Statement, then the Claim Form and Individual Release will be controlling and the Opt-Out Statement will be null and void, and the member will receive his/her share of the Settlement Amount and will be subject to the Release of Claims provided in Section 6 below.

### 4.6    Right to Revoke

Within ten (10) days following the close of the Opt-Out Period, the Settlement Administrator shall notify Class Counsel and Counsel for Morton's of the number of timely opt-outs. If more than 15% of the Settlement Class Members (other than any individual in Illinois who has an arbitration pending before the American Arbitration Association as of the date this Agreement is signed by Class Counsel) submit Opt-Out Statements, Morton's shall have the option, in its discretion, to withdraw from this Agreement, whereupon the Agreement shall be null and void for any and all purposes and may not be used or introduced in the Litigation or any other proceeding. If Morton's elects to exercise its rights under this provision, it will notify Class Counsel and the Arbitrator no later than ten (10) days after receiving notice of the number of timely opt-outs from the Settlement Administrator.

### 4.7    Objections to Settlement

(A)    Settlement Class Members other than those who have opted-out pursuant to Section 4.5 may object to the approval of this Settlement. To do so, such Settlement Class Member must inform the Arbitrator, Class Counsel, and Counsel for Morton's in writing of his or her intent to object and the grounds for his or her objection at least twenty-one (21) days (or such other number of days as the Arbitrator shall specify) before the date of the Final Fairness

- 6 -

and Approval Hearing described in Section 4.10, by following the procedure set forth in the Notice of Class Action Settlement. This deadline applies notwithstanding any assertion of non-receipt of the Settlement Class Member Documents by any Settlement Class Member. Any Settlement Class Member who submits a timely objection shall retain the right to submit a Claim Form and Individual Release until such objection has been adjudicated and thereafter for up to ten (10) days after the Final Fairness and Approval Hearing (or until such later date as the Arbitrator may order).

(B)     Any objection to the Settlement must be stated with particularity. Any Settlement Class Member filing an objection who intends to appear before the Arbitrator at the Final Fairness and Approval Hearing either in person or through counsel must so state in the objection his or her intention to appear, the purpose of the appearance, and whether the Settlement Class Member is represented by counsel.

(C)     Any Settlement Class Member who fails to file a timely written objection shall be foreclosed from objecting to this Settlement, unless otherwise ordered by the Arbitrator.

(D)     Class Counsel or Counsel for Morton's shall file any responses to any written objections, submitted by Settlement Class Members to the Arbitrator in accordance with this Agreement, at least seven (7) days before the Final Fairness and Approval Hearing.

### 4.8     Declaration of Compliance

As soon as practicable following the close of the period during which Settlement Class Members may submit Claim Forms and Individual Releases pursuant to Section 4.4, and Opt-Out Statements pursuant to Section 4.5, the Settlement Administrator shall provide Class Counsel and Counsel for Morton's with a declaration attesting to completion of the notice process set forth in this Section 4 and the number and identity of Settlement Class Members who have submitted timely and valid Claim Forms and timely Opt-Out Statements.

### 4.9     Sufficient Notice

Compliance with the procedures described in this Section 4 shall constitute due and sufficient notice to Settlement Class Members of this Settlement and shall satisfy the requirements of due process, and nothing else shall be required of the Settlement Claimants, Class Counsel, Counsel for Morton's, or the Settlement Administrator to provide notice of the Settlement and the Final Fairness and Approval Hearing pursuant to this Agreement.

### 4.10     Final Fairness and Approval Hearing

(A)     On November 11, 2009, or as soon as practicable thereafter, a Final Fairness and Approval Hearing shall be held for the Arbitrator to consider whether the Arbitrator should give this Agreement final approval; Class Counsel's application for attorneys' fees and costs; and any timely objections made pursuant to Section 4.7 and all responses by Settlement Claimants and Morton's to such objections.

(B)     At the Final Fairness and Approval Hearing, the Settlement Claimants and Morton's shall ask the Arbitrator to give final approval to this Agreement. Specifically, the

- 7 -

Arbitrator must approve the terms of the Settlement as fair, reasonable, and adequate, approve the Individual Release to be signed by Qualified Class Members as fair under the FLSA, conclude that the terms and conditions of the exchange of the Equity Portion of the Settlement Amount are procedurally and substantively fair and in the best interests of the recipients of said equity, and the equity issued pursuant to the Settlement is exempt under Section 3(a)(10) of the Securities Act from registration for offers and sales of securities in specified exchange transactions.

(C)    The allowance, disallowance, or modification by the Arbitrator of the application of Class Counsel for an award of attorneys' fees and costs are to be considered by the Arbitrator separately from the Arbitrator's consideration of the fairness, reasonableness, and adequacy of this Settlement. Any order or proceedings related to the attorneys' fees and costs application by Class Counsel, or appeal thereof, shall not operate to terminate or cancel this Settlement, or affect or delay the finality of an order granting final Arbitrator approval, or court confirmation and approval.

(D)    Except as may be required to obtain Court confirmation or enforce any terms of this Agreement or Individual Release, all documents, testimony, or other information submitted or considered in connection with the request for Preliminary Approval, Final Approval, or the Fairness Hearing, the Settlement Class Members and Class Counsel agree to keep all Arbitrator orders issued in connection therewith, and all terms of this Settlement, confidential to the extent not previously disclosed. Class Counsel will be permitted to communicate with Settlement Class Members who have not opted out under Section 4.5 and share such information as may be necessary to answer questions regarding the Settlement.

(E)    In connection with review by the Arbitrator, Settlement Claimants and Class Counsel agree to take available steps to preserve the confidentiality of this Settlement and to ensure the terms of which are not published by the American Arbitration Association.

(F)    If the Settlement Claimants and Morton's request for final approval is granted, an Award and Dismissal shall be entered in the Consolidated Arbitration, which shall dismiss all claims of the Settlement Claimants and Settlement Class Members with prejudice.

(G)    The Parties agree to take all steps as may be necessary to secure the Arbitrator's approval of this Settlement. The Parties further agree that they will not take any action adverse to each other in obtaining Arbitrator and Court approval of this Settlement. The Parties expressly agree that they will not file any objection, other than a request for correction, to the terms of this Settlement, or assist or encourage any person or entity to file any such objection.

### 4.11  Court Confirmation and Approval

Within 14 business days of the issuance of the Arbitrator's order granting Final Arbitrator Approval of the Settlement, the Parties shall apply to Judge Wolf of the United States District Court for the District of Massachusetts (or, if Judge Wolf is not available, any judge from the United States District Court for the District of Massachusetts) for an order (a) granting Court Confirmation of the Arbitrator's order, (b) approving the terms of the Settlement and the

- 8 -

Individual Releases, (c) concluding that the terms and conditions of the exchange of the Equity Portion of the Settlement Amount are procedurally and substantively fair and in the best interests of the recipients of said equity, and (d) finding the equity issued pursuant to the Settlement is exempt under Section 3(a)(10) of the Securities Act from registration for offers and sales of securities in specified exchange transactions. The Parties agree to take all steps necessary to secure Court confirmation and approval, including complying with any requirements necessary to obtain an exemption from Securities Act registration. The Parties further agree that they will not take any action adverse to each other in obtaining court confirmation and approval, and if, necessary, appellate court approval, of this Settlement. The Parties expressly agree that they will not file any objection, other than a request for correction, to the terms of this Settlement, or assist or encourage any person or entity to file any such objection.

## 5. SETTLEMENT PAYMENTS

### 5.1    Settlement Amount

Morton's agrees to pay a maximum amount of twelve million dollars ($12,000,000.00) ("the Settlement Amount")—six million dollars ($6,000,000.00) of which will be cash ("Cash Portion of the Settlement Amount") and six million dollars ($6,000,000.00) of which will be Preferred Stock to be issued by Morton's ("Equity Portion of Settlement Amount"). The Settlement Amount shall cover, resolve, and fully satisfy any and all amounts owed to Settlement Claimants, the Settlement Class, and Class Counsel, including all amounts allocated to Settlement Claimants and all attorneys' fees and costs, in settlement of all claims asserted in the Litigation, or that could have been asserted in the Litigation, by Settlement Claimants, on behalf of themselves and the Settlement Class they represent. Under no circumstances will Morton's be required to pay more than $6,000,000 in cash, other than amounts due to cover Employer Taxes, or issue more than $6,000,000 in Preferred Stock. In the event that this Agreement is canceled, rescinded, terminated, voided or nullified, however that may occur, or the Settlement is barred by operation of law, invalidated, or ordered not to be carried out by a court of competent jurisdiction, Morton's shall have no obligation to pay any of the Settlement Amount.

### 5.2    Service Payments to Settlement Claimants

Service Payments shall be made to Johnson, Aires, and Shewalter in the amount of twenty thousand dollars ($20,000) each. A Service Payment shall be made to Esposito in the amount of five thousand dollars ($5,000) if Esposito signs a separate release in accordance with Section 6.4 below. All Service Payments shall be made from the Cash Portion of the Settlement Amount.

### 5.3    Distribution of Settlement Amount

(A)    The Cash Portion of the Settlement Amount will be paid in quarterly installments over forty-eight (48) months following the Effective Date of the Settlement; provided, however, that in no event will the first payment be due before March 31, 2010. Morton's agrees to pay the Cash Portion of the Settlement Amount by delivering to the Settlement Administrator one check made payable to the Settlement Fund on or before the last

- 9 -

day of each quarter in the amounts set forth below; provided, however, that with respect to the fourth quarter of each calendar year, the check will be issued on or before December 15:

- Quarter 1: $250,000
- Quarter 2: $250,000
- Quarter 3: $250,000
- Quarter 4: $750,000

(B)     Within ten (10) days of receipt of each check, the Settlement Administrator shall do the following:

(1)     With respect to the first quarterly payment due under this Agreement, issue checks in the amount of $20,000 to Johnson, Aires, and Shewalter, and issue a check in the amount of $5,000 to Esposito;

(2)     Pay to the Settlement Administrator the amount of Administration Costs incurred and that are owed that have not yet been paid;

(3)     Issue a check to the equity advisor retained in accordance with Section 5.6 below for any fees that have been incurred and that are owed but have not yet been paid;

(4)     Subtract from the amount of the check received from Morton's the amount paid to the Settlement Administrator and equity advisor in accordance with Section 5.3(B)(1)-(2) above – and with respect to the first quarterly payment due under this Agreement the checks issued to Johnson, Aires, Shewalter, and Esposito ("Net Installment Amount");

(5)     Issue a check from the Net Installment Amount made payable to Class Counsel in proportion to the total amount of the Cash Portion of Attorneys' Fees and Costs;

(6)     Provide an accounting to Class Counsel and Counsel for Morton's of these payments; and

(7)     Issue individual checks from the Net Installment Amount made payable to each Qualified Class Member and Reserve Fund Claimant in proportion to the amount of cash owed to such individuals under the terms of this Agreement ("Quarterly Cash Payment").

(8)     Notwithstanding Section 5.3(B)(1)-(7) above, Qualified Class Members whose Quarterly Cash Payment is less than $100 will have their first three Quarterly Cash Payments each year held in the Settlement Fund until the end of the year. Such Qualified Class Members will receive the Cash Portion of their Actual Settlement Payment in annual, as opposed to quarterly, installments. The Settlement Administrator will issue checks to these individuals in the fourth quarter of each year in proportion to the

- 10 -

amount of cash owed to such individuals under the terms of this Agreement.

(C)     Morton's may elect to defer any cash payment due in 2010 until December 31, 2013 or sooner (a "Deferral"), and such Deferral, or any required payment herein not paid timely by Morton's, shall accrue simple interest at the per annum rate of 14%, which interest shall be payable in cash and allotted on a pro rata basis to Qualified Settlement Class Members.

(D)     Settlement Claimants, Qualified Settlement Class Members, and Reserve Fund Claimants will have ninety (90) days from the date of issue to cash the checks they receive under this Agreement. Ninety (90) days after such checks are issued, a stop payment order will be issued on uncashed checks. If a Settlement Claimant, Qualified Settlement Class Member, or Reserve Fund Claimant did not cash his or her check within the ninety (90) days, he or she can apply to the Settlement Administrator for a replacement check. All replacement checks must be requested within sixty (60) days after the final cash disbursement of the Settlement. Sixty (60) days after a replacement check is issued, a stop payment order will be issued. One hundred and twenty (120) days after the final cash disbursement of the settlement, any unclaimed funds deriving from such uncashed checks shall be subject to the provisions of Section 5.11(A) below.

(E)     Class Counsel's Equity Portion of Attorneys' Fees and Costs and each Qualified Settlement Class Member's Equity Portion of the Settlement Amount will be issued by Morton's to Class Counsel and Eligible Settlement Class Member as Preferred Stock within thirty (30) days following Court confirmation and approval of this Agreement, but no earlier than January 1, 2010, or longer as regulatory measures demand. Such Preferred Stock will be issued directly to Class Counsel and each Qualified Settlement Class Member pursuant to Rule 3(a)(10) of the Securities Act so that it will be freely tradable upon issuance without any requirement to file a registration statement. The Preferred Stock (and Common Stock issued upon conversion of Preferred Stock) shall be subject to customary market standoff provisions (no more than six months), but shall otherwise be freely tradable. Morton's will use its best efforts to ensure that the Preferred Stock will be listed on an exchange so that there will be a market for trading the Preferred Stock.

(F)     The Preferred Stock shall be convertible to Morton's Common Stock at the Conversion Price, which is the greater of $5.00 per share or the Common Stock Price (defined below) plus a 10% premium, at any time after the two-year anniversary of the issuance of the Preferred Stock. The "Common Stock Price" shall be computed using the average closing price of the common stock for the thirty (30) day period immediately preceding Court confirmation and approval.

(G)     No interests or dividends shall be paid on such Preferred Stock. Additionally, the Preferred Stock shall have no voting or other rights. Common Stock issued upon conversion of the Preferred Stock shall have the same voting rights as the existing Morton's common stock. The Preferred Stock shall have an aggregate liquidation preference of $6,000,000.00. Morton's shall have the right to redeem all or part of the Preferred Stock at its Liquidation Preference at any time prior to conversion.

(H)     Following Court confirmation and approval, if a dispute regarding distribution or equity arises, any such dispute will be resolved between Class Counsel and

- 11 -

Counsel for Morton's. If the dispute cannot be resolved between counsel, the Parties agree to submit the dispute to Arbitrator Roberta Golick for decision (provided that no new arbitration need be opened; rather, the dispute shall be submitted to her directly).

(I)    If a Covered Employee is barred from bringing any and all claims covered by this Settlement by either a valid release or by the doctrine of res judicata, such Covered Employee shall not receive notice of this settlement under Section 4.3. No Qualified Settlement Class Members who have already signed a release of all claims covered by this Settlement or received compensation for such claims through other lawsuits, class actions or agreements for, or have been deemed to have released, the claims covered by this Settlement, shall be permitted to collect any portion of the Settlement Amount or make any claim for which they have already been compensated.

### 5.4    Calculation of Attorneys' Fees and Costs

(A)    At the Final Approval and Fairness Hearing, Class Counsel shall petition the Arbitrator for payment of reasonable litigation costs and expenses actually incurred by Class Counsel, plus reasonable attorneys' fees in the amount of no more than one-third of the Cash Portion of the Settlement Amount ("Cash Portion of Attorneys' Fees and Costs") and one-third of the Equity Portion of the Settlement Amount ("Equity Portion of Attorneys' Fees and Costs") (collectively, "Attorneys' Fees and Costs"). Morton's will not oppose Class Counsel's petition for Attorneys' Fees and Costs.

(B)    Class Counsel understands and agrees that such payment shall be the full, final, and complete payment of all attorneys' fees and costs associated with Class Counsel's representation of individuals in connection with the Litigation. Morton's shall have no additional liability for any attorneys' fees or costs associated with the Litigation or the claims covered by this Settlement.

(C)    For all cash payments and Preferred Stock issued to Class Counsel, the Settlement Administrator shall distribute to Class Counsel the appropriate IRS Form 1099s at the appropriate time and in the manner required by the Internal Revenue Code. On the Equity Portion of Attorneys' Fees and Costs, the IRS Form 1099 will reflect the value of the shares Preferred Stock on the date of their receipt. It will be Class Counsel's responsibility to pay the appropriate federal, state, and local income taxes, interest, and other amounts due on their portion of such payments, and Class Counsel will hold Morton's harmless for any claims by the IRS, or any other taxing authority or other government agency (whether foreign, federal, state, or local), that may be made against Morton's arising out of or relating to any failure by Class Counsel to pay any portion of these payments for income or social security tax purposes, or for any other purpose. Class Counsel further agrees to reimburse Morton's for any resulting payment(s) to the IRS, or any other taxing authority or other government agency, that Morton's must make with respect to such claim.

### 5.5    Payment of Administrative Costs

"Administrative Costs" means all fees and costs incurred or charged by the Settlement Administrator in connection with the execution of its duties under this Agreement including, but

- 12 -

not limited to, (i) fees and costs associated with preparing, issuing and/or monitoring reports, filings and notices (including the cost of printing and mailing all notices and other documents to the Settlement Class) required to be prepared in the course of administering the terms of this Agreement and the Settlement Amount; (ii) computing the amount of the Estimated Settlement Payments to Settlement Class Members, taxes, attorneys' fees and costs, and any other payments to be made out of the Settlement Amount under this Agreement; (iii) preparing and filing any corporate tax returns and corporate information returns and any other filings required of the Settlement Administrator by any governmental taxing authority or other governmental agency; and (iv) advising Morton's of its liability for the Employer Taxes on settlement payments made to Qualified Settlement Class Members and Settlement Claimants that are allocated to wages. All Administrative Costs shall be paid from the Cash Portion of the Settlement Amount. The Settlement Administrator shall provide the Parties with an estimate of the total of Administrative Costs before any portion of the Settlement Amount is distributed to the Settlement Claimants, Qualified Settlement Class Members, or Class Counsel.

5.6   **Advisor for Settlement Class on Equity Portion of Settlement Amount**

Settlement Claimants may hire an advisor for Settlement Class Members related to the Equity Portion of the Settlement, whose fees shall not exceed $25,000, which shall be paid from the Cash Portion of the Settlement Amount. All such fees must be incurred on or before the distribution of the last issuance of the Cash Portion of the Settlement Amount.

5.7   **Calculation of Settlement Payment**

(A)   Using the information provided by Morton's pursuant to Section 4.3(A), the Settlement Administrator shall calculate each Settlement Class Member's "Estimated Settlement Payment" as follows:

(1)   The Settlement Administrator shall calculate each Settlement Class Member's Estimated Settlement Payment by: (i) identifying the greater of the applicable federal or state minimum wage for the Settlement Class Member during the Applicable Recovery Period; (ii) identifying the base hourly tip wage rate for the Settlement Class Member during the Applicable Recovery Period; (iii) subtracting (i) from (ii) (hereafter "Tip Differential"); (iv) identifying the Settlement Class Member's total work hours during the Applicable Recovery Period and multiplying by 75% (hereafter "Adjusted Hours") to account for only hours worked in the Dining Room; and (v) multiplying the Adjusted Hours by the Tip Differential, thereby calculating the Estimated Settlement. Settlement Class Members are not eligible to recover any cash or equity under this Settlement based on the time spent serving guests dining under Boardroom agreements, pursuant to which guests were subject to mandatory service charges imposed by Morton's.

(2)   In light of additional compensation provided to Captain Servers, for pay periods that a Settlement Class Member held the job of both

Captain and Server, his or her Adjusted Hours are to be multiplied by 80%.

(3)     In light of the different compensation practices related to non-servers, such as bussers and bartenders, for each Settlement Class Member whose primary job during a pay period within the Applicable Recovery Period was as a non-server, his or her Adjusted Hours will be multiplied by 33%.

(4)     For each Settlement Class Member who worked as a server in Massachusetts from November 7, 2000 through July 1, 2008, his or her Estimated Settlement Payment shall be his or her Estimated Settlement Payment multiplied by 120%.

(5)     The above-described Estimated Settlement Payment and related calculations shall be performed for each Settlement Class Member using the Settlement Class Member's electronic payroll data that Morton's is to provide pursuant to Section 4.3(A), above.

(B)     In the event the aggregate amount of the Estimated Settlement Payments of all Qualified Settlement Class Members exceeds the Settlement Amount (less the Service Payments, Attorneys' Fees and Costs, amount owed to the equity advisor under Section 5.6, the amount to be paid out from the Reserve Fund, Administration Costs, and any other reductions provided for in this Agreement), each Qualified Settlement Class Member's Estimated Settlement Payment shall be reduced on a pro rata basis, thereby determining the "Actual Settlement Payment."

(C)     Fifty percent (50%) of each Qualified Class Member's Actual Settlement Payment will be cash paid from the Cash Portion of the Settlement Amount ("Cash Portion of Actual Settlement Payment"). Fifty percent (50%) of each Qualified Class Member's Actual Settlement Payment will be Preferred Stock issued from the Equity Portion of the Settlement Amount ("Equity Portion of the Actual Settlement Payment").

## 5.8   Cap on Settlement Payment

Under no circumstances will Morton's be required to pay more than $6,000,000 in cash, other than amounts due to cover its share of Employer Taxes, or issue more than $6,000,000 in Preferred Stock.

## 5.9   Calculation of Actual Settlement Payment to Reserve Fund Claimants

The portion of the Reserve Fund actually distributed to Reserve Fund Claimants ("Actual Reserve Fund Claimant Payment") shall equal fifty percent (50%) of each Reserve Fund Claimant's Estimated Settlement Payment, less applicable taxes and withholdings as required by federal, state, and local law.

## 5.10   Taxability of Actual Settlement Payments and Service Payments

- 14 -

(A)     The Cash Portion of the Actual Settlement Payment paid to each Qualified Settlement Class Member will be treated as wages, and shall be subject to applicable federal, state, and local tax withholding.  The Settlement Administrator shall be responsible for determining the amount of such withholdings, shall withhold such amounts, and shall pay such amounts to the applicable taxing authority under its own taxpayer identification number.  The Settlement Administrator shall timely prepare and distribute IRS Form W-2s reflecting these wage payments and tax withholdings.

(B)     The wage portion of each Actual Settlement Payment will be treated as regular wages for income tax withholding purposes to the extent permitted by applicable law. Income tax withholdings also will be made pursuant to applicable state and/or local withholding codes or regulations.  Withholding amounts shall be determined with reference to the Qualified Settlement Class Members' and Settlement Claimants' last IRS Form W-4 provided to, and on file with, Morton's.  To the extent no such form is on file, the default classifications established by the applicable taxing authority will apply.

(C)     The employer portion of all required payroll taxes relating to the Actual Settlement Payment under this Agreement ("Employer Taxes") shall be paid by Morton's in accordance with applicable federal, state, and local laws.  The Settlement Administrator shall timely provide Morton's such information as Morton's requires to calculate such tax amounts.

(D)     The Equity Portion of each Actual Settlement Payment to Qualified Settlement Class Members, the Service Payments, and any interest paid to Qualified Settlement Class Members pursuant to Section 5.3(C) will be treated as non-wage-related damages, payments, or interest, as the case may be.  IRS Form 1099s reflecting the Equity Portion of each Actual Settlement Payment will be distributed to Qualified Settlement Class Members and Settlement Claimants reflecting the values of these shares on the date of their receipt.  The appropriate IRS Form 1099s reflecting the amount of the Service Payments and any interest paid to Qualified Settlement Class Members pursuant to Section 5.3(C) will be distributed to the Settlement Claimants and/or Qualified Settlement Class Members in accordance with the Internal Revenue Code.

(E)     Qualified Settlement Class Members and Settlement Claimants shall be solely responsible for all taxes due with respect to payments received pursuant to this Agreement (other than Employer Taxes).  Qualified Settlement Class Members and Settlement Claimants shall hold Morton's harmless for any claims by the IRS, or any other taxing authority or other government agency (whether foreign, federal, state, or local), that may be made against Morton's arising out of or relating to any failure to pay any income or other taxes owed by him or her.

(F)     This Agreement does not constitute legal advice by counsel for any of the parties to this Agreement concerning any federal, state, or local tax issue.  To the extent this Agreement, or any of its attachments, is interpreted to contain or constitute advice regarding any federal, state, or local tax issue, such advice is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding any tax liability or penalties.

5.11   **Unclaimed Funds**

- 15 -

(A)    Any unclaimed Cash Portion of the Settlement Amount will be retained by Morton's and solely used by it to fund a new benefit for Morton's employees or reinstate a pre-existing benefit for Morton's employees (such as 401(k) matching or employee appreciation program) as determined by Morton's management with notice to Class Counsel.

(B)    Any and all interest earned with respect to the Cash Portion of the Settlement Amount prior to its distribution will be remitted to Morton's.

(C)    To the extent any shares of the Equity Portion of the Settlement Amount are not claimed by Settlement Class Members, the shares shall be used to fund a new benefit for Morton's employees or reinstate a pre-existing benefit for Morton's employees (as described in the previous paragraph).

## 6. WAIVER AND RELEASE

6.1    Settlement Claimants and Settlement Class Members who worked as Covered Employees in Massachusetts during the Applicable Recovery Period and who do not opt-out of this Settlement pursuant to Section 4.5 hereby waive, release, and promise never to assert in any forum any and all claims which they ever had or may presently have, that were or could have been asserted or raised in the Litigation against any of the Released Parties (defined in Section 6.5 below) at any point in time up to and including the Effective Date of this Agreement, concerning or in any way related to Morton's of Chicago's practice of applying or taking of a tip or meal credit, the distribution of service charges and tips to employees, unlawful failure to pay for all the time worked (i.e., off-the-clock work), or any violation of state or federal minimum wage laws, and related notice violations, penalties, interest, costs, attorneys' fees, compensatory damages, punitive damages, liquidated damages, and any other remedies for such claims available at law or in equity under state or federal law.  Upon the issuance of an order granting court confirmation and approval, this waiver and release shall be binding on Settlement Claimants and all Settlement Class Members who have not exercised the right to opt-out pursuant to Paragraph 4.5 above, and shall be binding on their respective attorneys, agents, spouses, executors, representatives, guardians *ad litem*, heirs, successors, assigns, or anyone claiming through them.

6.2    Settlement Claimants and Settlement Class Members who worked as Covered Employees in any state or territory in the United States (including the District of Columbia), other than the State of Massachusetts, during the Applicable Recovery Period and who do not opt-out of this Settlement pursuant to Section 4.5 hereby waive, release, and promise never to assert in any forum any and all claims which they ever had or may presently have, that were or could have been asserted or raised in the Litigation against any of the Released Parties (defined in Section 6.5 below) at any point in time up to and including the Effective Date of this Agreement, concerning or in any way related to Morton's of Chicago practice of applying or taking of a tip or meal credit, the distribution of service charges and tips to employees, or any violation of state or federal minimum wage laws, and related notice violations, penalties, interest, costs, attorneys' fees, compensatory damages, punitive damages, liquidated damages, and any other remedies for such claims available at law or in equity under state or federal law.  Upon the issuance of an order granting court confirmation and approval, this waiver and release shall be binding on Settlement Claimants and all Settlement Class Members who have not exercised the

- 16 -

right to opt-out pursuant to Paragraph 4.5 above, and shall be binding on their respective attorneys, agents, spouses, executors, representatives, guardians *ad litem*, heirs, successors, assigns, or anyone claiming through them.

6.3     Each Settlement Claimant hereby waives, releases, and promises never to assert in any forum any and all charges, complaints, claims, or liabilities (including attorneys' fees and costs actually incurred) of any nature whatsoever, known or unknown, suspected or unsuspected, that he or she now has or claims to have and that arose on or prior to the date of this Settlement, or that he or she at any time heretofore had or claimed to have, against each or any of the Released Parties (defined in Section 6.5 below), and any and all claims that could have been asserted by that Settlement Claimant or on his or her behalf in any and all charges, affidavits, complaints, or other documents that were filed or could have been filed by them with any local, state or federal court or agency; provided, however, that he or she does not release any claims that he or she is precluded from waiving by operation of law and any right to pursue claims before the Equal Employment Opportunity Commission and the National Labor Relations Board, but forfeits any monetary recovery or other relief should the EEOC, NLRB, or any other agency pursue claims on his or her behalf.  This waiver and release shall take effect upon the Effective Date of this Agreement, and be binding on Settlement Claimants, agents, spouses, executors, representatives, guardians *ad litem*, heirs, successors, assigns, or anyone claiming through them.

6.4     In order to receive her Service Payment, Esposito will sign a separate release form in which she will agree that she hereby waives, releases, and promises never to assert in any forum any and all charges, complaints, claims, or liabilities (including attorneys' fees and costs actually incurred) of any nature whatsoever, known or unknown, suspected or unsuspected, that she now has or claims to have and that arose on or prior to the date of this Settlement, or that she at any time heretofore had or claimed to have, against each or any of the Released Parties (defined in Section 6.5 below), and any and all claims that could have been asserted by Esposito or on her behalf in any and all charges, affidavits, complaints, or other documents that were filed or could have been filed by them with any local, state or federal court or agency; provided, however, that she does not release any claims that he or she is precluded from waiving by operation of law and any right to pursue claims before the Equal Employment Opportunity Commission and the National Labor Relations Board, but forfeits any monetary recovery or other relief should the EEOC, NLRB, or any other agency pursue claims on his or her behalf. This waiver and release shall take effect upon the Effective Date of this Agreement, and be binding on Settlement Claimants, agents, spouses, executors, representatives, guardians *ad litem*, heirs, successors, assigns, or anyone claiming through them.

6.5     The Claim Form and Individual Release Form that is to be executed and returned by Settlement Class Members who worked as Covered Employees in the State of Massachusetts during the Applicable Recovery Period shall contain the following language:

As a material inducement to Morton's to enter into this Agreement, Claimant, on behalf of herself/himself, her/his heirs, executors, administrators, and/or assigns, does hereby irrevocably and unconditionally release and forever discharge Morton's and any related Morton's of Chicago entity, together with their parents, subsidiaries, affiliates, partners, joint ventures, predecessor and

- 17 -

successor corporations and business entities, past, present and future, and their agents, directors, officers, employees, shareholders, executives, counsel, members, insurers and reinsurers, representatives, attorneys, and employee benefit plans (and the trustees or other individuals affiliated with such plans) past and present (collectively, the "Released Parties"), of and from any and all causes of action, suits, debts, complaints, claims and demands whatsoever in law or in equity, whether known or unknown, suspected or unsuspected, which such Claimant, or her/his heirs, executors, administrators, and/or assigns, ever had or now has against each or any of the Released Parties, from the beginning of time to the date of execution of this Agreement, that were or could have been asserted or raised in the Litigation against the Released Parties at any point in time up to and including the Effective Date of this Settlement, concerning or in any way related to Morton's of Chicago practice of applying or taking of a tip or meal credit, the distribution of service charges and tips to employees, unlawful failure to pay for all the time worked (i.e., off-the-clock work), or any violation of state or federal minimum wage laws, and related notice violations, penalties, interest, costs, attorneys' fees, compensatory damages, punitive damages, liquidated damages, and any other remedies for such claims available at law or in equity under state or federal law.

The undersigned agrees that this waiver and release shall be binding on his or her attorneys, agents, spouses, executors, representatives, guardians *ad litem*, heirs, successors, assigns, or anyone claiming through him or her.

The undersigned shall not publicize or discuss with third-parties, other than counsel, any term of the Settlement beyond the statement that the Arbitration has been resolved on terms mutually agreeable to all parties. The undersigned agrees that neither he or she, nor any persons acting on the undersigned's behalf will contact any representative of the media (press, television, radio or Internet) or make any press or public statement concerning this Settlement, and if contacted by any representative of the media or press, the undersigned will only state the matter has been satisfactorily resolved on mutually agreeable terms.

6.6    The Claim Form and Individual Release Form that is to be executed and returned by Settlement Class Members who worked as Covered Employees in any state or territory in the United States (including the District of Columbia), other than the State of Massachusetts, during the Applicable Recovery Period shall contain the following language:

As a material inducement to Morton's to enter into this Agreement, Claimant, on behalf of herself/himself, her/his heirs, executors, administrators, and/or assigns, does hereby irrevocably and

- 18 -

unconditionally release and forever discharge Morton's and any related Morton's of Chicago entity, together with their parents, subsidiaries, affiliates, partners, joint ventures, predecessor and successor corporations and business entities, past, present and future, and their agents, directors, officers, employees, shareholders, executives, counsel, members, insurers and reinsurers, representatives, attorneys, and employee benefit plans (and the trustees or other individuals affiliated with such plans) past and present (collectively, the "Released Parties"), of and from any and all causes of action, suits, debts, complaints, claims and demands whatsoever in law or in equity, whether known or unknown, suspected or unsuspected, which such Claimant, or her/his heirs, executors, administrators, and/or assigns, ever had or now has against each or any of the Released Parties, from the beginning of time to the date of execution of this Agreement, that were or could have been asserted or raised in the Litigation against the Released Parties at any point in time up to and including the Effective Date of this Settlement, concerning or in any way related to Morton's of Chicago practice of applying or taking of a tip or meal credit, the distribution of service charges and tips to employees, or any violation of state or federal minimum wage laws, and related notice violations, penalties, interest, costs, attorneys' fees, compensatory damages, punitive damages, liquidated damages, and any other remedies for such claims available at law or in equity under state or federal law.

The undersigned agrees that this waiver and release shall be binding on his or her attorneys, agents, spouses, executors, representatives, guardians *ad litem*, heirs, successors, assigns, or anyone claiming through him or her.

The undersigned shall not publicize or discuss with third-parties, other than counsel, any term of the Settlement beyond the statement that the Arbitration has been resolved on terms mutually agreeable to all parties. The undersigned agrees that neither he or she, nor any persons acting on the undersigned's behalf will contact any representative of the media (press, television, radio or Internet) or make any press or public statement concerning this Settlement, and if contacted by any representative of the media or press, the undersigned will only state the matter has been satisfactorily resolved on mutually agreeable terms.

Each Claim Form and Individual Release shall become effective against each Settlement Class Member on the date that he or she executes his or her Claim Form and Individual Release.

## 7. LIMITATIONS ON THE USE OF THIS SETTLEMENT

### 7.1   No Admission

- 19 -

(A)    Morton's expressly denies that any of its entities, officers, employees, or agents engaged in any illegal or improper conduct. This Settlement, including all exhibits and related documents, does not constitute, is not intended to constitute, and will not be deemed to constitute an admission by Morton's, or any of its officers or agents, as to the merits of any of the allegations or claims made in the Arbitration. Rather, Morton's denies all of the allegations in the Arbitration and denies any and all liability of any kind to anyone with respect to the alleged facts and causes of action asserted in the Arbitration.

(B)    This Settlement, including all exhibits and related documents, does not constitute, is not intended to constitute, and will not be deemed to constitute an admission or consent by Morton's with respect to appropriateness of class treatment or inclusion of particular claims, individuals, or entities in the Arbitration except for the purposes of this Settlement.

7.2    **Public Statements.**

Neither Plaintiffs nor Class Counsel shall make any public statements regarding this Settlement, except as required by legal process and except to say that the matter was satisfactorily resolved, or words to that effect, following the Court's final approval of the Settlement. Notwithstanding this provision, Class Counsel may respond as necessary to inquiries or requests from Settlement Class Members or other individuals who assert that they should be or should have been considered to be Settlement Class Members. Class Counsel may post a brief statement regarding the Settlement action on their website. Such statement shall not, however, include the Settlement Amount or any of the specific terms of this Agreement and shall not indicate that Morton's has in any way admitted any wrongdoing or the truth of any allegation in the Litigation.

7.3    **Non-Evidentiary Use**

Nothing in this Settlement, including any action taken in the implementation thereof, any statements, discussions or communications, and any materials prepared, exchanged, issued, or used during the course of the negotiations leading to the Settlement, is intended to be introduced, used, or deemed admissible in any way in the Arbitration or any other judicial, arbitral, administrative, investigative, or other forum or proceeding as evidence of any violation of any federal, state, or local law, statute, ordinance, regulation, rule, or executive order, or any obligation or duty at law or in equity. Notwithstanding the foregoing, the Settlement may be used in any proceeding that has as its purpose the interpretation, implementation, or enforcement of the Settlement, or any orders, rulings, or judgments of the Court entered in connection therewith.

7.4    **No Collateral Attack**

This Agreement shall not be subject to collateral attack by any Settlement Claimant or Settlement Class Member or any recipient of Class Notice after the Effective Date of the Settlement. Such prohibited collateral attacks shall include but not be limited to claims that a Settlement Claimant or Settlement Class Member's Estimated or Actual Settlement Payment was improperly calculated or adjusted, or that the Settlement Class Member failed to submit a timely claim for any reason.

7.5    **Nullification**

(A)    If the Arbitrator or the Court should for any reason fail to approve this Settlement, then (i) this Settlement shall be considered null and void; (ii) neither this Settlement nor any of the related negotiations or proceedings shall be of any force or effect; (iii) all Parties shall stand in the same position, without prejudice, as if the Settlement had been neither entered into nor filed with the Arbitrator; and (iv) neither the Settlement Claimants, Settlement Class Members, nor Class Counsel shall receive any benefit, nor suffer any detriment, from this Settlement.

(B)    If the Arbitrator or Court fails to approve of the Agreement, the Parties will prepare notice to the Settlement Class that the Agreement did not receive final approval and that, as a result, no payments will be made under this Agreement. Such notice shall be mailed by the Settlement Administrator via First Class United States mail to the addresses used by the Settlement Administrator in mailing the Settlement Class Member Documents. The Settlement Administrator will trace all returned undeliverable notices and re-send to the most recent addresses available. The Parties will share in equal parts the administrative costs incurred in connection with this attempted settlement and the attempted execution of this Agreement.

(C)    In the event that this Settlement is cancelled, rescinded, terminated, voided, nullified, or invalidated, Morton's shall have no obligation to make any payments under this Agreement and any amounts already paid shall immediately be refunded to Morton's.

(D)    Invalidation of any material portion of this Settlement shall invalidate this Settlement in its entirety, unless the Parties agree in writing that the remaining provisions will remain in full force and effect.

## 8. MISCELLANEOUS PROVISIONS

8.1    **Payments Do Not Trigger Right to Benefits**

Any payments to Settlement Class Members pursuant to this Agreement and/or their Individual Release Agreements do not trigger any entitlement or right to benefits under Morton's benefit plans. All payments to Settlement Class Members shall be deemed to be paid in the year in which such payments actually are received. It is expressly understood and agreed the receipt of a payment by a Settlement Class Member will not entitle any such individual to additional compensation or benefits under any company bonus, contest, or other compensation or benefit plan or agreement in place during the period covered by the Agreement, nor will it entitle any such individual to any increased retirement, 401(k) benefits or matching benefits, or deferred compensation benefits. It is the intent of the Parties that the settlement payments made pursuant to this Agreement are the sole payments to be made to Settlement Class Members other than amounts otherwise due to Settlement Class Members from Morton's for wages, salaries and other compensation for work (a) performed by Settlement Class Members for Morton's on or after the date of this Agreement; or (b) performed by Settlement Class Members for Morton's prior to the date of this Agreement but unpaid by Morton's pursuant to their standard payroll practices. Settlement Class Members are not entitled to any new or additional compensation or benefits as a result of having received a payment under this Agreement (notwithstanding any

DLI-6251148v6

contrary language or agreement in any benefit or compensation plan document that might have been in effect during the period covered by this Agreement).

### 8.2    No Inducements

Settlement Claimants and Class Counsel acknowledge that they are entering into this Agreement as a free and voluntary act without duress or undue pressure or influence of any kind or nature whatsoever and that neither Settlement Claimants nor Class Counsel has relied on any promises, representations or warranties regarding the subject matter hereof other than as set forth in this Agreement.

### 8.3    Representations and Warranty

Settlement Claimants and Settlement Class Members jointly and severally represent and warrant to Morton's and Counsel for Morton's that, other than Shannon Liss-Riordan of Lichten & Liss-Riordan, P.C., there are no attorneys who have claims for fees or costs arising out of the Litigation contemplated hereby. Settlement Claimants further represent and warrant that they are authorized to execute this Agreement and any amendments thereto on behalf of the Settlement Class and to take all appropriate actions required or permitted pursuant to this Agreement in order to effectuate its terms.

### 8.4    No Assignment

None of the rights, commitments, or obligations recognized under this Agreement may be assigned by any of the Settlement Claimants or Settlement Class Members without the express written consent of Morton's. The representations, warranties, covenants, and agreements by Morton's contained in this Agreement are for the sole benefit of Settlement Claimants and Settlement Class Members under this Agreement, and shall not be construed to confer any right or to avail any remedy to any other person.

### 8.5    Governing Law and Forum Selection

This Agreement shall be governed, construed, and interpreted, and the rights of Settlement Claimants, Settlement Class Members, Class Counsel, and Morton's and the Released Parties shall be determined in accordance with Illinois law, without regard to its conflicts of laws principles, and shall be subject to the continuing jurisdiction of the United States District Court for the District of Massachusetts for the limited purpose of implementing and enforcing the Agreement.

### 8.6    No Representations

Settlement Claimants represent and acknowledge that in executing this Agreement, they do not rely and have not relied upon any representation or statement not set forth herein made by Morton's or by any of the Morton's' agents, representatives, or attorneys with regard to the subject matter, basis, or effect of this Agreement or otherwise.

### 8.7    Severability

DLI-6251148v6

The provisions of this Agreement are severable, and if any part of it is found to be unenforceable, the other paragraphs shall remain fully valid and enforceable. This Agreement shall survive the termination of any arrangements contained herein.

### 8.8   No Waiver

The failure to enforce at any time, or for any period of time, any one or more of the terms of this Agreement shall not be a waiver of such terms or conditions or of such party's right thereafter to enforce each and every term and condition of this Agreement.

### 8.9   Sole and Entire Agreement

This Agreement contains the entire understanding of Settlement Claimants, Class Counsel, and Morton's in respect of the subject matter contained herein. This Agreement has been drafted jointly and is not to be construed against any party. There are no restrictions, promises, representations, warranties, covenants, or undertakings governing the subject matter of this Agreement other than those expressly set forth or referred to herein. This Agreement supersedes all prior agreements and understandings among Settlement Claimants, Class Counsel, and Morton's with respect to the settlement of the Litigation.

### 8.10   No Modifications

No modification of this Agreement shall be effective unless the same be in writing duly executed by all parties hereto.

### 8.11   Counterparts

This Agreement may be executed in multiple counterparts, each of which shall constitute an original, and all of which shall constitute a single document. Facsimile signatures shall have the same effect as original signatures.

### 8.12   Attorneys' Fees and Costs

Neither Party nor any attorneys acting for, or purporting to act for the Parties may recover or seek to recover any amounts for fees, costs or disbursements from any other Party except as expressly provided herein.

### 8.13   Cooperation Clause

Class Counsel and Counsel for Morton's agree to cooperate to effectuate this Settlement, including securing the Arbitrator's and Court's approval and assisting with the administration of the Settlement in accordance with the terms of this Agreement.

**\*\* Remainder of Page Intentionally Left Blank; Signature Page Follows \*\***

- 23 -

Agreed to on behalf of each of Settlement Claimants and Settlement Class Members Individually and Collectively :

Date: _July 21_, 2009  By: _[signature] Shannon Liss-Riordan_

Shannon Liss-Riordan, Esq.
Lichten & Liss-Riordan, P.C.
100 Cambridge Street, 20th Floor
Boston, Massachusetts 02114
(617) 994-5800


Date: _____, 2009          _____
                                  Class Representative Mark Johnson


Date: _____, 2009          _____
                                  Class Representative Kristin Aires


Date: _____, 2009          _____
                                  Class Representative Samantha Shewalter


                                  _[signature] Scott Levin / SVP + General Counsel_

Date: _July 22_, 2009             For Morton's Restaurant Group, Inc., Morton's
                                  of Chicago, Inc. and Morton's of
                                  Chicago/Boston, Inc.


- 24 -

Agreed to on behalf of each of Settlement Claimants and Settlement Class Members Individually and Collectively :

Date: July 21, 2009  By: _____

Shannon Liss-Riordan, Esq.
Lichten & Liss-Riordan, P.C.
100 Cambridge Street, 20th Floor
Boston, Massachusetts 02114
(617) 994-5800

Date: 07-22, 2009        _____
                         Class Representative Mark Johnson


Date: _____, 2009   _____
                         Class Representative Kristin Aires


Date: _____, 2009   _____
                         Class Representative Samantha Shewalter


Date: _____, 2009   _____
                         For Morton's Restaurant Group, Inc., Morton's
                         of Chicago, Inc. and Morton's of
                         Chicago/Boston, Inc.

DLI-6251148v6

Agreed to on behalf of each of Settlement Claimants and Settlement Class Members Individually
and Collectively :

Date: _____, 2009  By: _____

Shannon Liss-Riordan, Esq.
Lichten & Liss-Riordan, P.C.
100 Cambridge Street, 20th Floor
Boston, Massachusetts 02114
(617) 994-5800


Date: _____, 2009            _____
                                       Class Representative Mark Johnson



Date: _____, 2009            _____
                                       Class Representative Kristin Aires



Date: 7/21_____, 2009                _____
                                       Class Representative Samantha Shewalter



Date: _____, 2009            _____
                                       For Morton's Restaurant Group, Inc., Morton's
                                       of Chicago, Inc. and Morton's of
                                       Chicago/Boston, Inc.


- 24 -

LIVING | ARTS E1

**PORTISHEAD STRIKES**
**ANOTHER MELANCHOLY NOTE**

BUSINESS C1

Grand Theft Auto IV
hits shelves today

SPORTS D1

Celtics fall;
series evened

VOLUME 273
NUMBER 120
75 cents

# The Boston Globe

TUESDAY, APRIL 29, 2008

VERNAL EQUAL K?

Today: *Breezy, rain en*
*High 53-58. Low 40-*
Tomorrow: *Breezy, cloudy*
*High 53-58. Low 37-*
HIGH TIDE: *6:16 a.m. 6:5*
SUNRISE: *5:42 a.m.* SUNSET:
FULL REPORT: Page E

*'It's physically tiring. . . . They*
*work hard for those tips.'*
SHANNON LISS-RIORDAN, *lawyer*

## Skycaps and waiters
## find a legal champion

### Lawyer's suits target tip-skimming

**By Jonathan Saltzman**
GLOBE STAFF

Days after a federal jury ordered American Airlines to pay a group of nine local skycaps more than $325,000 in lost tips, the plaintiffs and their legal team celebrated with a boisterous dinner at Ruth's Chris Steak House at Boston's Old City Hall.

The skycaps ordinarily spend their workdays lifting heavy baggage onto carts at Logan International Airport's curbside, but on this recent evening they raised wine glasses and beer mugs over plates of rib eye steaks to toast their lead lawyer, Shannon Liss-Riordan, whom they dubbed "Sledgehammer Shannon."

The dinner party got superb service, Liss-Riordan said, which is hardly surprising; she recently filed class-action suits on behalf of waiters and waitresses at the upscale restaurant who have accused management of skimming their tips, too.

**LISS-RIORDAN, Page A9**



DINA RUDICK/GLOBE STAFF

Shannon Liss-Riordan met with Don DiFiore of Dracut,
lead plaintiff in a lawsuit against American Airlines.

# Skycaps and waiters find a legal champion

► LISS-RIORDAN
*Continued from Page A1*

Since 2001, Liss-Riordan, a partner in a modest-size law firm in downtown Boston, has brought at least 40 lawsuits on behalf of waiters, bartenders, and other service workers in Massachusetts who say their employers cheated them out of tips.

She took an obscure 1952 state law that protects tip-dependent workers, who can legally be paid less than minimum wage, and has used it to reap millions of dollars in awards and settlements. Lawyers outside Massachusetts have adopted her strategy, including the lawyers who recently won a $100 million award for baristas at Starbucks cafes in California.

A Harvard Law School graduate who helped found a feminist activist group in the early 1990s, Liss-Riordan originally wanted to be a civil rights lawyer. Instead, the Houston native has become something of an avenging angel for workers who rely on customers' generosity as they carry plates of sirloin and scrod, mix mojitos and martinis, and hoist luggage.

"It's hard work," Liss-Riordan, 38, said of such jobs. "It's physically tiring, it's stressful, and you have to be good dealing with people. They work hard for those tips, and part of the problem with the industry is a lot of managers and owners look at the tips and think, 'They shouldn't be making that much money.' So they want to take a piece of it, or subsidize their labor costs for other employees."

Her clients speak of her almost reverently. Don Benoit, one of about 40 waiters who successfully sued the former Federalist restaurant in Boston in Suffolk Superior Court last year for failing to give them all of the 21 percent service charge added to bills at private functions, called her "brilliant." A former American Airlines skycap who expects to get about $3,000 in back tips from the airline said Liss-Riordan champions the "kickstand of corporate America."

But critics say she has manipulated an arcane and confusing law to reap a windfall for her clients and firm. If such litigation continues, detractors say, awards could skyrocket as a result of a state law



DAVID L. RYAN/GLOBE STAFF
Shannon Liss-Riordan (left) and co-counsel Hillary Schwab have won lawsuits on tips for low-paid service workers.

passed this month mandating that employers pay triple damages for violations of so-called wage-and-hour laws. Critics say the suits hurt fragile businesses and, sometimes, her clients' co-workers.

"I have a lot of respect for Shannon, but I do see this cottage industry she's created around the tip statute as becoming abusive toward employers," said Ariel D. Cudkowicz, who has defended many restaurants, hotels, and Gillette Stadium against Liss-Riordan's suits, reaching out-of-court settlements in several. The prospect of large awards, he said, is "very alluring" to plaintiffs and their lawyers. Liss-Riordan's firm keeps one-third of the money it obtains for clients.

Liss-Riordan first made national headlines in the early 1990s when she joined the daughter of writer Alice Walker and helped founded the Third Wave, a nonprofit group that led voter registration drives in the wake of the Anita Hill-Clarence Thomas hearings.

After graduating from Harvard Law in 1996 and clerking for a federal judge in Texas, she joined the firm Pyle, Rome, Lichten & Ehrenberg and has been there since. Her mentor, Harold L. Lichten, a well-known labor and employment lawyer, said she is "the smartest, most pugnacious, and toughest attorney I've ever met."

It is not uncommon for him to arrive at their Tremont Street office in the morning only to find Liss-Riordan at her desk after

working through the night, he said, "which is particularly amazing given that she has three kids." Liss-Riordan's husband is a writer and stay-at-home father.

Most of her suits allege violations of a state law that prohibits management at restaurants, bars, and hotels from taking a portion of tips reserved for waiters and bartenders who can legally be paid as little as $2.63 an hour, well below the state's minimum wage of $8 an hour.

Some restaurants say other employees, including managers and maitre d's, deserve a share of tips because they sometimes serve food and drinks and also earn relatively low wages. But Liss-Riordan says that if those workers deserve more money, owners should raise their pay.

Defendants have included the Four Seasons Hotel, the Weston Golf Club, Northeastern University, the Palm, and Ruth's Chris, whose Boston lawyer declined to comment. One of the biggest awards came in 2006 when an Essex County jury ordered Hilltop Steakhouse in Saugus to pay an estimated $2.5 million in damages to wait staff, but both sides settled out of court before the judgment became final.

In 2004, the Legislature expanded the 1952 statute to cover employees outside the food and beverage industries, paving the way for Liss-Riordan's skycaps suit. In that complaint, skycaps contended the airline violated the tips law when it began charging

passengers a $2-per-bag fee for curbside check-in service in September 2005. Skycaps testified that tips plunged because many passengers mistakenly thought the workers kept the $2 fee and were reluctant to tip on top of it.

The airline countered that it put up signs specifying that the fee excluded tips. But the jury sided with the plaintiffs, ordering the airline on April 7 to turn over all the fees to the skycaps. They will receive amounts ranging from $3,066 to $64,138, Liss-Riordan said. She has since filed similar suits on behalf of skycaps from United Airlines and US Airways.

Her co-counsel in about half the cases has been Hillary Schwab, a 34-year-old partner at the firm.

Lawyers elsewhere in the country have followed Liss-Riordan's lead. Last month, a San Diego County judge ordered Starbucks to pay at least 120,000 baristas in California more than $100 million in tips and interest to cover gratuities that the company handed over to shift supervisors.

Starbucks condemned the ruling and said the judge did not consider the interests of shift supervisors who "deserve their fair share of the tips." Nonetheless, Liss-Riordan wasted no time filing similar suits in Massachusetts and New York on behalf of baristas there.

Several people in the restaurant and hotel business say such litigation harms the industry. William Sander, general manager of the Fifteen Beacon Hotel, location of the former Federalist restaurant, criticized a December verdict siding with wait staff who said management illegally shared their tips with private dining room co-ordinators. He said the law was unclear about which employees were entitled to tips.

If restaurants are forced to pay managers more, he said, "you'll end up closing 90 percent of the restaurants in the country."

That's hogwash, said Liss-Riordan.

A well-managed business, she said, "does not dip into tips to make ends meet."

*Jonathan Saltzman can be reached at jsaltzman@globe.com.*

*LawyersandSettlements.com*

Legal News. True Stories.

# Attorney Shannon Liss-Riordan:
# Challenging Corporate Power and Tips Abuse

*April 9, 2008. By Paul Halpern*



*Boston, Massachusetts:* LawyersandSettlements' interview with Shannon Liss-Riordan, a partner in the labor, employment, and class action law firm of Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C. was delayed a day. That's because Liss-Riordan had to be in court for the verdict in a Massachusetts tips case taken against American Airlines. It was the first thing she mentioned when we reached her the next morning, so we took it from there.

*LawyersandSettlements (LAS): What was your latest verdict about?*

Shannon Liss-Riordan (SLR): We just got a verdict yesterday. We won restitution of $325,000 on behalf of nine Skycaps at Logan International Airport who sued American Airlines, who like some other airlines have recently been charging passengers $2 per bag for curbside checkin. We charged that this practice violated the Massachusetts tip law, and we won. The jury also found tortious interference and violation by American Airlines with the Skycaps' relationship with passengers.

*LAS: What did the tortious interference finding determine?*

It involved the same cash that passengers have always been willing to pay Skycaps as tips for the convenience of curbside checkin—avoiding hauling their bags inside and standing in line in the terminal to check in for a flight. We argued that the checkin fee essentially redirected the Skycaps' tips to American Airlines.

Many passengers thought this fee was a mandatory tip for the Skycaps; we argued that people didn't realize that the money wasn't going to the Skycaps; it was going directly into the coffers of American Airlines. The jury found that this constituted tortious interference under the Massachusetts tip law, but it did not for the one Skycap we represented from Lambert/St. Louis Airport in Missouri, since Missouri doesn't have a tip law.

Originally we asked that the case be certified as a national class action. The judge denied that, but since we've now won at the state level, we may be seeking again to have it certified, and because jury found tortious interference under Massachusetts law, we believe that if we can get certified as a national class action, we can persuade a jury that we have tortious interference elsewhere as well. Now that we've won in Massachusetts, we believe this shows we've got a serious case and we can go forward.

*LAS: You've also recently filed a class action for baristas against Starbucks for tip pooling violations similar to the recent successful action in California. Does the Massachusetts state labor code have a tips clause like the one in California?*

SLR: The Massachusetts tips law is even more favorable to baristas than California; it's actually the most protective in the nation. The tips law refers to "an employer or its agent" in New York, where we've also filed, and in California. In California they found that the shift supervisors were "employer's agents". In Massachusetts, you don't even have to do the "agency" analysis; the law simply states that no employees with any managerial authority may receive any share of pooled tips. The Massachusetts state attorney general has issued an advisory to this effect, so we think the Massachusetts case is even easier than the California case.

*LAS: Given that, do you think that Starbucks may decide to settle in Massachusetts rather than go to trial?*

SLR: Well, that would be a welcome change! I've found, though, that in most of these cases, they'll fight it all the way through trial. Starbucks has vowed to fight this case, they've vowed to appeal the California decision, and they're trying to make themselves look like a benevolent employer. Why can't they just admit they made a mistake and correct their workplace practices?

I find this a lot with tips and wage and hour cases. The employers will fight it and fight it, and then years down the road, when they lose, they wind up paying much more. I'll be glad to take on that fight. I've filed at least 40 tips class actions over the years; I've settled about 20, and the rest are pending. Some of the cases I'm settling now I filed in 2002, and the settlements are much bigger now because they've been accruing interest all along. Along the way, the employers have made every argument imaginable, and they've lost virtually every time.

We won the Skycaps tips case this week, we won against Hilltop Steakhouse in 2006, and we won against the Federalist Restaurant in December 2007. So we've won three trials, we've won many summary judgments, we won an

appeal against Northeastern University that reversed a lower court ruling and gave a summary judgment for our plaintiffs. So we've pretty much established the law in this area.

*LAS: Wouldn't it make more sense for employers to simply comply with the state tips law?*

SLR: You'd think it would, but it's mind boggling the way employers try to get around these rulings. When I started doing these cases in 2001, employers were saying, "Oh, we didn't know there was a tips law; our mistake, sorry." I was suspicious about that then, and by now those arguments are wearing thin. Every business in Massachusetts should know there's this law and they should keep their hands off their employees' tips. They've been finding more and more ingenious ways to get around it, and they're failing; in case after case we beat them.

The latest trick is that they think they can call the service charges that are automatically included in a customer's check a 15 percent "administrative charge". They think that if they change the titles of their managers, that's going to make it okay. So people who were called managers are now captains or leads or something like that, but that doesn't do it. They try implementing arbitration clauses to prevent employees from suing them in class actions. It's been a busy seven years.

*How did you get involved in this type of class action? What keeps you at it?*

SLR: Tips lawsuits are what got me involved in wage and hour law in the first place. In 2001, a waiter called me and asked, "Hey, my manager is taking some of our tips; isn't there supposed to be a law against that?" I said, "That's interesting—let me check this out." So I went and found that this tips law had been on the books since 1952, but there were no published decisions related to it. It had been flagrantly violated across the industry.

Since then, I've won more than a dozen decisions, and that's had a ripple effect. I've been getting calls from across the country, including one from California in 2004. I sent them some information, and I got a call back from them recently to say, "Hey, we thought you might like to know how this all turned out." It turned out to be the Starbuck's tips case, and they won over $100 million in damages. I said, "Wow, fabulous!"

It's really exciting to see workers coming together and realizing that they have rights and they can take action to protect them. Word gets out, someone gets a settlement, one case leads to another. I get calls from waiters in Massachusetts and now around country, saying, "Hey, I didn't know that I could do something about this."

It takes a lot of time, a lot of sweat, a lot of writing briefs, a lot of arguing before judges, but I love doing work that's sticking up for the little guy, supporting working people. I love going against large corporations who think they're above the law because of their wealth and resources, and turning the tables on them and helping workers find their voice.

It's very exciting and very powerful to bring a case that can have repercussions for many employees in a class action that helps people who live paycheck to paycheck or shift to shift, even in a non-unionized setting. This is an exciting other way that workers can stand up for themselves.

*Attorney Shannon Liss-Riordan, a graduate of Harvard College, received her JD cum laude from Harvard Law School in 1996. She has been with Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C., for nearly ten years and has been a partner since 2002. In 2002 as well, she was named one of ten Lawyers of the Year by Massachusetts Lawyers Weekly for her anti-discrimination and First Amendment rights work.*